## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OHIO PUBLIC EMPLOYEES RETIREMENT SYSTEM and THE STATE TEACHERS RETIREMENT SYSTEM OF OHIO, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | Civil Action No. 1:22-cv-08171 |
| Plaintiffs, | The Honorable Valerie E. Caproni |
| v. | **AMENDED CLASS ACTION COMPLAINT** |
| DISCOVERY, INC; WARNER BROS. DISCOVERY, INC.; DAVID ZASLAV; GUNNAR WIEDENFELS; ADVANCE/NEWHOUSE PARTNERSHIP; ADVANCE/NEWHOUSE PROGRAMMING PARTNERSHIP; STEVEN A. MIRON; ROBERT J. MIRON; and STEVEN O. NEWHOUSE, | |
| Defendants. | |

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................. 1

II.     PARTIES ............................................................................................................ 6

     A.    Lead Plaintiffs.......................................................................................... 6

     B.    Defendants ............................................................................................... 7

III.   JURISDICTION AND VENUE ....................................................................... 10

IV.   FACTS ............................................................................................................. 10

     A.    History of the WarnerMedia Business ................................................... 10

     B.    Background of Discovery and Zaslav's Desire to Acquire WarnerMedia ................................................................................ 14

     C.    The Merger Negotiations and Due Diligence ............................... 16

     D.    The Merger Terms ................................................................................ 20

     E.    The Registration Statement, Prospectus and Other Offering Documents .......................................................................... 21

     F.    Certain Defendants' Financial Incentives for the Merger .................. 26

     G.    The Announcement of the Merger .................................................... 30

VIII.  THE OFFERING DOCUMENTS WERE FALSE AND MISLEADING ................. 33

     A.    The Offering Documents' Representations About the Number of HBO and HBO Max Subscribers Were False and Misleading ........................... 34

          1.    The Importance of Streaming Subscribers to Investors .............. 34

          2.    Misrepresentations About Subscriber Numbers .......................... 36

          3.    The Reaction of the Market to the Changed Subscriber Numbers ................................................................................ 39

     B.    The Offering Documents Were False Because They Failed to Disclose That WarnerMedia Had "Halted" Licensing Its Content ... 41

          1.    The Importance of Content Licensing to WarnerMedia's Business ................................................................................ 41

          2.    Misrepresentations About Content Licensing ................................ 41

     C.    The Offering Documents Were False Because They Failed to Disclose That WarnerMedia Failed to Develop an "Investment Case" Before Pouring Billions into New Content Development ....................................... 45

     D.    The Offering Materials Were False Because They Did Not Disclose That WarnerMedia Had Shifted Its Film Strategy to Direct-to-Streaming ........................................................................ 49

E.      THE OFFERING DOCUMENTS WERE FALSE BECAUSE THEY FAILED
        TO DISCLOSE THAT CNN+ WOULD BE TERMINATED ............................. 52

F.      THE OFFERING DOCUMENTS WERE FALSE BECAUSE THEY FAILED TO DISCLOSE
        THAT DISCOVERY'S DUE DILIGENCE OF WARNERMEDIA WAS FLAWED .............. 59

X.      REVELATION OF THE TRUTH AND LOSS CAUSATION ................................. 67

XI.     CLASS ACTION ALLEGATIONS ................................................. 72

XII.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................... 73

XIII.   CLAIMS FOR RELIEF ........................................................ 74

XIV.    PRAYER FOR RELIEF ........................................................ 81

XV.     JURY DEMAND .............................................................. 81

Court-appointed Lead Plaintiffs the Ohio Public Employees Retirement System ("OPERS") and the State Teachers Retirement System of Ohio ("Ohio STRS") (together, "Lead Plaintiffs"), on behalf of all others similarly situated, allege the following against Discovery, Inc. ("Discovery"); Warner Bros. Discovery, Inc. ("WBD"); David Zaslav; Gunnar Wiedenfels; Advance/Newhouse Partnership and Advance/Newhouse Programming Partnership (together, "Advance/Newhouse"); Steven A. Miron; Robert J. Miron; and Steven O. Newhouse (collectively "Defendants"), upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge.

Lead Plaintiffs' information and belief is based on, among other things, their counsel's investigation, which includes without limitation: (a) a review and analysis of regulatory filings made by Discovery, AT&T, Inc. ("AT&T") and WBD with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by Discovery, AT&T and WBD; (c) a review and analysis of public statements made by Defendants; and (d) a review of other publicly available information concerning Discovery, AT&T and WBD, including news stories and court filings.

I.     NATURE OF THE ACTION

1.     This is a securities class action which asserts claims under Section 11, Section 12(a)(2), and Section 15 of the Securities Act of 1933 (the "Securities Act"). This action is brought on behalf of all persons or entities who acquired WBD common stock pursuant to Discovery's February 4, 2022 Registration Statement on Form S-4 (the "Registration Statement," *see* ¶ 69); the Post-Effective Amendment No. 2 to the Registration Statement filed by Discovery with the SEC pursuant to 17 C.F.R. § 230 462 (b) on April 8, 2022 ("Amendment No. 2," *see* ¶ 73); or the Joint Proxy Statement/Prospectus filed with the SEC on February 10, 2022 (the "Prospectus," *see* ¶ 77) (collectively, with the "Spinco Information Statement" (defined in ¶ 74) and the "Form 424(b)"

(defined in ¶ 76), the "Offering Documents" (defined in ¶ 84) by one of these mechanisms: (1) exchanged Discovery common stock for WBD common stock; (2) exchanged Magallanes, Inc. ("Spinco") common stock for WBD common stock; or (3) purchased shares of WBD common stock on the open market during the period beginning April 11, 2022 through August 4, 2022, both dates inclusive (the "Class").

2.      This action asserts strict liability and negligence claims against Defendants under Sections 11, 12(a)(2) and 15 of the Securities Act for false and misleading statements made in the Offering Documents and in earnings calls.  The statements made in earnings calls constitute prospectuses and are actionable under Section 12(a)(2).  Lead Plaintiffs specifically disclaim any allegations of fraud or fraudulent intent on the part of any person or entity who made the statements alleged to be false or misleading.

3.      This action arises out of the acquisition by Discovery of the Warner Media business and related assets ("WarnerMedia") from AT&T to form WBD (the "Merger" or the "Transaction").  This combination of these two large media businesses was accomplished through a merger between Discovery and Spinco, the latter of which had been created as a wholly-owned subsidiary of AT&T specifically for the purpose of effecting the separation of the WarnerMedia business from AT&T, and into which AT&T transferred its WarnerMedia assets.  Pursuant to the Offering Documents, shareholders of Spinco and former shareholders of Discovery acquired shares of the newly-formed WBD on April 8, 2022.  WBD common stock traded for the first time on the NASDAQ exchange on April 11, 2022.

4.      The Offering Documents included information about WarnerMedia which was false and misleading.  In addition, Defendants David Zaslav (the former CEO of Discovery, and current CEO of WBD) and Gunnar Wiedenfels (the former CFO of Discovery and current CFO of

WBD) made false and misleading statements during earnings calls about WarnerMedia and the Merger between the time that the Merger was announced, on May 17, 2021 and when the Merger closed, on April 8, 2022. (*See* ¶¶ 120, 135, 139, 142, 156, 158, 171, 173, 193, 195, 197, 208, 211, 213 and 216, below.)

5.      **First**, the Offering Documents reported the total number of subscribers for HBO and HBO Max (a streaming service).  These reported numbers included non-paying subscribers who had not activated their accounts, but the Offering Documents did not disclose the number of such non-paying subscribers, which was a material amount.  In fact, at least 10% of WarnerMedia's reported subscribers, and 11% of WarnerMedia's and Discovery's combined reported subscribers, were non-paying subscribers.  The number of HBO and HBO Max subscribers was one of the most critical metrics reported to investors, particularly given WarnerMedia's strategy to drive subscribers to its streaming service and Zaslav's stated plan to combine WarnerMedia's streaming service, HBO Max, with Discovery's streaming service, Discovery+.  (*See* ¶¶ 110-131, below.)

6.      **Second**, Defendants did not disclose that, prior to the merger, WarnerMedia had "halted" its lucrative business practice of licensing its content to third party providers, in an effort to channel subscribers to HBO and HBO Max.  Nor did Defendants disclose that halting those licensing deals would have a material effect on WarnerMedia's profitability and in particular its cash flows. (*See* ¶¶ 132-145, below.)

7.      **Third**, Defendants did not disclose that WarnerMedia had committed billions of dollars to developing new content but had not performed return on investment analyses to determine if these expensive projects would be profitable and justified the financial commitment. Making these significant, but unjustified, investments in new content had further eroded WarnerMedia's cash flows. (*See* ¶¶ 146-159, below.)

8.      **Fourth**, in December 2020, WarnerMedia announced that it would dramatically alter its feature film releases for the year 2021.  Partly in response to Covid, but also in an effort to drive subscribers to the HBO Max streaming service, WarnerMedia decided it would release its full-length feature films simultaneously on HBO Max and in movie theaters.  This strategy was less profitable for WarnerMedia than the typical process where feature films were released exclusively to movie theaters for a period of time.  Although WarnerMedia had stated this practice would exist only in 2021, in fact, it continued the practice into 2022, a fact which was not disclosed in the Offering Documents.  (*See* ¶¶ 160-174, below.)

9.      **Fifth**, prior to the Merger, WarnerMedia, announced it would launch a new streaming app, CNN+, which would provide solely news content.  The launch was widely anticipated among media circles and investors, and WarnerMedia had spent over $300 million before April 8, 2022 to develop and promote the streaming service.  However, Zaslav and Wiedenfels believed CNN+ was a poor investment and had decided before the Merger closed to cancel CNN+.  Within hours of the start of trading in WBD common stock on April 11, 2022, Zaslav and Wiedenfels canceled the entire marketing budget for CNN+, and just a few days later, announced that CNN+ was being canceled altogether.  The Offering Documents were misleading because they failed to disclose Discovery's plan to shutter CNN+.  (*See* ¶¶ 175-198, below.)

10.     **Sixth**, the Offering Documents did not disclose that Discovery had not performed adequate due diligence of the WarnerMedia business prior to the close of the Merger.  During earnings calls on April 26, 2022 and August 4, 2022, Defendants conceded that there was information concerning the aforementioned categories of WarnerMedia's business which they had not analyzed during the due diligence process but which was critical to a proper evaluation of the WarnerMedia assets that Discovery acquired.  Investors were unaware that Discovery had not

performed even the most fundamental due diligence analyses, such as determining whether the billions of dollars in content investment was justified, or the status of WarnerMedia's lucrative third party licensing contracts.  (*See* ¶¶ 199-219, below.)

11.    After the Merger closed on April 8, 2022, the truth began to emerge.  On April 21, 2022, it was first publicly reported that WBD had cancelled CNN+ and the price of WBD stock fell from $23.01 to $21.45, or 6.8%.

12.    WBD held its first post-closing earnings call on the morning of April 26, 2022, before the market opened.  During that call, Zaslav and Wiedenfels announced that they expected WBD's operating profit for 2022 to be $500 million less than what had been disclosed in the Registration Statement.  On April 26, 2022, the price of WBD stock declined from $21.50 per share to $19.83 per share, a decline of 7.5%.

13.    On August 4, 2022, after the market closed, WBD held its quarterly earnings call for the quarter ended June 30, 2022.  During this call, Wiedenfels referred to "a number of approved investments and foregone revenue in various parts of the business that, when taken together, impacted full year 2022 EBITDA by roughly $2 billion."  Wiedenfels proceeded to outline a litany of specific facts that had been withheld from the Offering Documents which contributed to the $2 billion reduction in 2022 EBITDA (and which also explained the $500 million reduction announced April 26, 2022).  These material facts had either been misstated in or omitted from the Offering Documents, as well as in other public statements promoting the Merger. In reaction, WBD stock declined from $17.48 at the close of August 4, 2022 to $14.59 at the close of August 5, 2022, a drop of 16.5%.

14.    As a result of the foregoing facts, investors who acquired and/or purchased WBD securities pursuant to or traceable to the Offering Documents suffered damages.  The market

capitalization of WBD declined from $60.1 billion on April 11, 2022 (the date that WBD securities were first publicly traded) to $35.4 billion on August 5, 2022 (following disclosures of the reasons for WBD's downward revisions of expected EBITDA and cash flow).

## II.    PARTIES

### A.    Lead Plaintiffs

15.    Lead Plaintiffs OPERS and Ohio STRS (together, "Lead Plaintiffs") are two Ohio public pension funds, which act as fiduciaries for Ohio public employees.  Both funds are based in Columbus, Ohio.

16.    Lead Plaintiff **Ohio Public Employees Retirement System** ("**OPERS**") provides retirement, disability and survivor benefit programs for public employees throughout Ohio who are not covered by another state or local retirement system.  With assets under management of approximately $123.8 billion as of December 31, 2021, OPERS is the largest state pension fund in Ohio, and the 13th-largest public retirement system in the United States.  OPERS acquired WBD common stock as follows:

a.    On April 8, 2022, OPERS acquired 278,917 shares of WBD common stock in exchange for 278,917 shares of Discovery common stock.

b.    On April 8, 2022, OPERS acquired 1,097,663 shares of WBD common stock in exchange for 4,537,361 shares of Spinco common stock.

c.    OPERS purchased WBD common stock on the open market on April 19, 2022, May 31, 2022, and June 24, 2022.

17.    Lead Plaintiff **State Teachers Retirement System of Ohio** ("**Ohio STRS**") has more than $98.1 billion of assets under management and administers retirement benefits on behalf of 500,000 active, inactive and retired Ohio public educators.  Ohio STRS provides comprehensive retirement benefits to its members, which it accomplishes, in part, through its principles regarding

research, development, evaluation and risk management.  Ohio STRS acquired WBD common stock as follows:

a.      On April, 8, 2022, Ohio STRS acquired 82,949 shares of WBD common stock in exchange for 82,949 shares of Discovery common stock.

b.      On April 8, 2022, Ohio STRS acquired 760,329 shares of WBD common stock in exchange for 3,142,940 shares of Spinco common stock.

c.      Ohio STRS purchased WBD common stock on the open market on April 18, 2022 and April 28, 2022.

**B.**    **Defendants**

18.     Defendant **Discovery, Inc.** ("**Discovery**") was, until April 8, 2022, a Delaware corporation with its principal place of business in New York, New York.  Discovery was a media company that provided primarily unscripted (*i.e.*, "reality") television programing for its networks which included HGTV, the Food Network, the Discovery Channel, and ID Discovery.  Until April 8, 2022, Discovery had several classes of stock which traded publicly on NASDAQ under the tickers DISCA, DISCB, and DISCK.  Discovery issued the Registration Statement, Amendment No. 2 and the other Offering Documents described in paragraphs 65-84, below, pursuant to which WBD's common stock was issued, and which contained false and misleading statements.

19.     Defendant **Warner Bros. Discovery, Inc.** ("**WBD**") is a Delaware corporation with its principal place of business in New York, New York.  WBD was formed when the Merger became effective on April 8, 2022 and is the successor in interest to Discovery.  WBD describes itself as "a leading global media and entertainment company that creates and distributes the world's most differentiated and complete portfolio of content and brands across television, film and streaming."  WBD owns and operates multiple well-known brands, including Discovery Channel, Discovery+, Warner Bros., CNN, HBO, HBO Max, the Food Network, HGTV, the

7

Discovery Channel and TNT.  WBD was formed upon the closing of the Merger between Discovery and Spinco, a Delaware corporation first wholly owned by AT&T, and into which AT&T transferred its WarnerMedia assets to effectuate the Merger.  WBD's common stock was issued to Discovery and Spinco shareholders pursuant to the Registration Statement and Amendment No. 2.  WBD's common stock began trading publicly on the NASDAQ under the ticker symbol "WBD" on April 11, 2022.

20.     Defendant **David M. Zaslav** ("**Zaslav**") was President and CEO of Discovery from 2007 through the Merger and was a director of Discovery since 2008.  Following the Merger, Zaslav became President and CEO of WBD.  Zaslav signed the Registration Statement and the other Offering Documents and made false and misleading statements in connection with the Merger.

21.     Defendant **Gunnar Wiedenfels** ("**Wiedenfels**") was the CFO of Discovery from April 2017 through the Merger.  Following the Merger, Wiedenfels became CFO of WBD.  Wiedenfels signed the Registration Statement and the other Offering Documents and made false and misleading statements in connection with the Merger.

22.     Defendants **Advance/Newhouse Partnership** and **Advance/Newhouse Programming Partnership** (together, "**Advance/Newhouse**") are privately-held businesses owned by the Miron and Newhouse family that are part of the family's vast media empire.  At the time of the Merger, Advance/Newhouse held approximately 23% of Discovery's aggregate voting power through its ownership of all of the shares of both Discovery's Series A-1 and Series C-1 preferred stock.  These preferred shares gave Advance/Newhouse special rights, including the right to veto any potential merger and the right to appoint three directors to Discovery's Board of Directors (the "Board").  Each share of Advance/Newhouse's Series A-1 and Series C-1 preferred

stock could be exchanged for nine shares of Discovery's Series A common stock, and 19.3648 shares of Discovery's Series C common stock, respectively.   The three Discovery Directors appointed by Advance/Newhouse at the time of the Merger were Steven A. Miron, Robert J. Miron and Susan M. Swain.

23.   Defendant **Steven A. Miron** ("**Steven Miron**"), one of Advance/Newhouse's appointees to the Discovery Board, was a director of Discovery since 2008.   Following the completion of the Merger, Steven Miron now serves as a director of WBD, and also an appointee of Advance/Newhouse.   Steven Miron is the son of Robert J. Miron and a member of the Newhouse/Miron family, which controlled approximately 23% of Discovery's aggregate voting power at the time of the Merger.   Steven Miron is currently the CEO of Advance/Newhouse Partnership and was previously the President of Advance/Newhouse Programming Partnership. Steven Miron signed the Registration Statement and other Offering Documents.

24.   Defendant **Robert J. Miron** ("**Robert Miron**") was a director of Discovery since 2008 as one of Advance/Newhouse's appointees to the Discovery Board.   Robert Miron is the father of Steven Miron and a member of the Newhouse/Miron family, which controlled approximately 23% of Discovery's aggregate voting power at the time of the Merger.   Robert Miron signed the Registration Statement and other Offering Documents.

25.   Defendant **Steven O. Newhouse** ("**Newhouse**") has been a director of WBD since the closing of the Merger as one of Advance/Newhouse's appointees to WBD's Board.   He previously served as a "board observer" on Discovery's Board.   Newhouse is a member of the Newhouse/Miron family, which controlled approximately 23% of Discovery's aggregate voting power at the time of the Merger.   Newhouse is also a co-president of Advance Publications, Inc.

The Registration Statement named Newhouse, with his consent, as a person who would become a director of WBD.

26.     Discover, WBD, Zaslav, Wiedenfels, Advance/Newhouse, Steven Miron, Robert Miron, and Newhouse are collectively referred to as "**Defendants**."

## III.   JURISDICTION AND VENUE

27.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) and 77o).

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

29.     Venue is proper in this Judicial District under 28 U.S.C. § 1391 and Section 22 of the Securities Act (15 U.S.C. § 77v).  Many of the acts and transactions alleged in this Complaint, including the dissemination of materially untrue and misleading statements, occurred in substantial part in this District; Discovery had and WBD has its principal offices in this District; Discovery common stock traded on the NASDAQ within this District; and WBD common stock trades on the NASDAQ within this District.

30.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate wire and telephone communications, and the facilities of NASDAQ, a national securities exchange.

## IV.   FACTS

### A.     History of the WarnerMedia Business

31.     The WarnerMedia business has a rich history. Throughout its evolution, WarnerMedia has been widely recognized and highly lauded as a global leader in the media industry with one of the largest film and TV studios in the world and unparalleled premium

content.  Evolving through a series of corporate transactions spanning decades, the current assembly of WarnerMedia brands includes Warner Bros. Pictures (the film studios which have produced such mega-hits as the Harry Potter series and the Lord of the Rings trilogy); HBO (the premium cable TV provider which has produced hit series such as the Sopranos, Sex and the City and Game of Thrones); Cinemax (another premium cable TV provider); CNN; the Turner Broadcasting System (which includes the channels TBS and TNT, and contains sports programming such as MLB, NBA and NHL); and the Metro-Goldwyn-Mayer film library.

32.    HBO came under the WarnerMedia (f/k/a "Warner Communications") umbrella on May 9, 1973, when Time Life Broadcast, Inc. sold the HBO business to Warner Communications for $20 million.  Since that time, HBO has become one of the most important components of the WarnerMedia library.  In the late 1990s HBO produced several successful original series including the Larry Sanders Show, Sex and the City, Oz, and the Sopranos.  HBO's reputation for high quality programming continued into the 2000s with the premieres of Six Feet Under, Trueblood, Westworld, Game of Thrones and Curb Your Enthusiasm.

33.    The book "It's Not TV: The Spectacular Rise, Revolution and Future of HBO," ("It's Not TV") written by *Bloomberg* media reporter Felix Gillette and seasoned *New York Times* media reporter John Koblin, was released on November 1, 2022.  "It's Not TV" examines the 50-year history of HBO and includes interviews from both creative talent and corporate executives. Gillette and Koblin were interviewed by Nilay Patel, a reporter for *The Verge*, and the interview was published on February 7, 2023.

34.    HBO's business model was to develop or purchase content that it would then license to cable providers.  HBO was thus a "wholesaler," and "never had a direct relationship with [its] customers," Gillette told Patel in *The Verge* interview.  Gillette continued that HBO

"never had any data on customers," and "had to come up with some other way of figuring out what it was that people would watch – and they did.  Over the course of several decades, HBO facilitated an instinctive way of trusting artists and not really worrying at all about data and signals in the marketplace."

35.     In the same interview in *The Verge*, Koblin agreed, stating that HBO "didn't really know much about their subscribers, so HBO executives basically just had to wing it."  He described a business model whereby HBO put tremendous trust into its creative staff and content creators, without performing much research about whether the content would be popular.

36.     On October 22, 2016, AT&T announced that it intended to acquire Time Warner, in a deal valued at $109 billion.  AT&T's acquisition of Time Warner closed on June 14, 2018.

37.     At the time that AT&T acquired Time Warner, John Stankey ("Stankey") was the Chief Operating Officer ("COO") of AT&T.  Following AT&T's acquisition of Time Warner in June 2018, Stankey became the CEO of WarnerMedia.  On December 31, 2020, Randall Stephenson, then the CEO of AT&T, retired, and Stankey took his place as CEO of AT&T, leaving a gap at WarnerMedia.  This gap was filled by Jason Kilar, who remained as CEO of WarnerMedia until just before the close of the Merger, when he resigned on April 5, 2022.

38.     During Stankey's tenure as CEO of WarnerMedia and then AT&T, the so-called "streaming wars" were heating up.  Streaming services deliver content directly to consumers over Wi-Fi or internet service plans, for example, directly to iPads, mobile phones and other devices.  This contrasts with traditional content delivery systems, such as through cable television providers like Verizon, or satellite TV, such as DirectTV, which are known as "linear" services.  The WarnerMedia streaming service would eventually be named "HBO Max".

39.     In November 2019, Disney launched "Disney+," an app that would house all Disney content in one place.  This move was a reaction to the rise of Netflix, which pioneered streaming services, and which many media companies viewed as an existential threat.

40.     Stankey believed that WarnerMedia had to compete with the Disney+ and Netflix streaming services.  Because of the caché associated with the HBO brand, Stankey wanted to put all WarnerMedia content on a single streaming service called "HBO Max."  The strategy would be to channel as many subscribers as possible to the HBO Max streaming service.  This would be accomplished in two ways: (1) ceasing licensing agreements that delivered WarnerMedia content to third party providers, so that consumers would have to subscribe to the HBO Max streaming service if they wanted to watch WarnerMedia's popular library of films and television shows; and (2) investing significantly in developing new WarnerMedia content.

41.     WarnerMedia announced that it was announcing HBO Max on October 10, 2018.  However, HBO Max did not actually launch until May 27, 2020, far behind schedule.  By then, Disney+, AppleTV+, Peacock, Quibi, Netflix, Hulu and Amazon Prime had already established themselves in the streaming market.

42.     HBO Max struggled to gain traction from the start.  Viewers – including current HBO subscribers – did not know how to access and activate HBO Max on their iPhones and other streaming devices.  In addition, WarnerMedia had failed to solidify distribution agreements with Roku, which was the dominant smart TV manufacturer, and carried a pool of nearly 40 million potential HBO viewers.  WarnerMedia was also having trouble reaching a licensing agreement with Amazon, another smart TV producer, and whose customer pool included another potential 40 million viewers.

43.     Jason Kilar, who had been a founder and former CEO of Hulu (another streaming service), assumed the helm at WarnerMedia in May 2020, when Stankey stepped down as CEO of WarnerMedia.  With his background in streaming, Kilar also strongly believed that streaming was critical to HBO's future, and doubled-down on Stankey's efforts to drive subscribers to HBO Max. In addition to committing billions of dollars in investments in new content development, Kilar announced on December 3, 2020 that WarnerMedia's entire upcoming 2021 film slate would be released on HBO Max the same day as the theatrical releases.  The roster of films included blockbusters such as "Godzilla vs. Kong," "In the Heights" (from Lin-Manuel Miranda), "The Many Saints of Newark" (the film prequel to the "Sopranos") and "Dune."  This became known as "Project Popcorn," and was viewed as a bold and controversial move within the film industry, particularly because it threatened traditional movie theaters, which were already suffering from low attendance due to Covid.

44.     The financial impact of the strategic moves to drive viewers to HBO Max was twofold: WarnerMedia forfeited a significant amount of revenue that it had previously generated through licensing its content to other providers while also sinking sizeable resources and funding into generating new content.  As a result of the strategy, WarnerMedia had difficulty generating cash flows.

**B.      Background of Discovery and Zaslav's Desire to Acquire WarnerMedia**

45.     Discovery, originally known as the Discovery Channel, was founded in 1985 by John Hendricks.  According to the Registration Statement (p. 41/674), Discovery "is a global media company that provides content across multiple distribution platforms, including linear platforms such as PayTV, free-to-air and broadcast television, digital distribution arrangements, content licensing arrangements and next generation DTC subscription products, including discovery+," a subscription service.  As of December 31, 2020, Discovery provided content to 3.7

14

billion subscribers and viewers worldwide.  As of September 30, 2021, Discovery had 20 million total paying direct-to-consumer ("DTC") subscribers.  Some of Discovery's best-known brands include HGTV, Food Network, TLC, Animal Planet, Investigation Discovery, Travel Channel and Science.

46.    Zaslav became the CEO of Discovery in 2007.  Throughout his tenure, Discovery was largely considered a second-tier media company.  Still, Zaslav had become one of the highest paid media executives, and received $246.6 million in compensation in 2021.

47.    Zaslav recognized that the future of the media business lay in streaming services, as more viewers demanded to access their favorite content where they wanted and when they wanted.  If Discovery were to remain relevant, it would have to expand its content library in order to grow its streaming subscriber base.  The most direct way to do that would be to acquire another company's content library, and WarnerMedia became an early target for Zaslav.  In April 2019, Zaslav made his first pitch to combine the assets of Discovery and WarnerMedia.  According to "It's Not TV," he visited the Time Warner Center in New York City and made a PowerPoint presentation to a team at WarnerMedia, highlighting the complementary nature of Discovery's reality-based programming and WarnerMedia's storied library of scripted series.  Zaslav proposed a joint venture between Discovery and WarnerMedia, but Stankey was not interested.

48.    According to "It's Not TV," Zaslav met with other companies, but ultimately decided to launch Discovery+ with just Discovery content.  He positioned it as an alternative to Netflix, Apple TV+ and HBO Max, because Discovery+ would provide viewers with "ambient noise," *i.e.*, content that would play in their backgrounds as they attended to other matters. Discovery+ launched in January 2021, during one of the most restrictive periods in the Covid pandemic and enjoyed some early, modest success.  However, Zaslav recognized that Discovery+

was incomplete without a roster of respected scripted series.  According to "It's Not TV," he stated, "Almost all of the players in the business moved toward scripted series and scripted movies.  They went to the big stars and the red carpet.  The big shiny object.  We're not as shiny, and we don't have a lot of red carpets."

49.     Zaslav knew that combining Discovery with WarnerMedia would catapult him into the realm of America's most famous and powerful media moguls – a group which includes Rupert Murdoch and Robert Iger.  As "It's Not TV" put it, "The red carpets of HBO beckoned."  Zaslav viewed the Merger as imperative to his legacy.  Shortly after the Merger was announced, Zaslav stated in an article appearing in *Vanity Fair* on October 13, 2021, "I think this deal will be the first sentence of my obituary."  The article observed that Zaslav's "new rock star clout was apparent when dozens of moguls emerged from quarantine in July [2021] and returned to the mountains of Sun Valley, Idaho, for the annual Allen & Company retreat.  'There was a line wherever he was,' said Oprah Winfrey, who didn't go this year, but got a scene report from Gayle King.  Another big shot who was there confirmed, 'it was certainly a new level of activity.'"

50.     Zaslav had recognized HBO as the crown jewel of WarnerMedia's assets.  According to "It's Not TV," once the Merger was announced, Zaslav "took up every chance he could get to talk up the network," saying, 'My gosh, HBO. . . . Our ambition is that those three letters, everywhere in the world, people are going to say that's the place to go to see great stories, great talent, and just have some fun.'"  He further gushed, "'To me, HBO was like the gravitational pull into this industry.'  To anyone who questioned HBO's longevity, Zaslav said, 'Not only do I love it, but I think it's gonna make it.  It was the lead horse for the industry for a long, long time.'"

**C.     The Merger Negotiations and Due Diligence**

51.     During 2019 and early 2020, AT&T had to invest heavily in developing its 5G spectrum network, a critical step in staying competitive in its primary telecommunications

business.  Meanwhile, the strategy at WarnerMedia to build HBO Max into a viable competitor to Disney+ and Netflix meant that AT&T was diverting significant resources to producing new content development.  Stankey was grappling with these competing goals.

52.     Zaslav continued to believe that a combination of WarnerMedia's scripted programming and Discovery's reality-based content would make both businesses stronger together than apart, and he was undeterred by Stankey's rejection of his joint venture proposal in 2019. According to "It's Not TV," Zaslav watched as "AT&T's challenges mounted," and "waited for the right moment to rekindle the conversation."

53.     On February 13, 2021, Zaslav reached out to Stankey to propose a possible combination of Discovery and WarnerMedia.  (Registration Statement p. 190/674.)

54.     Two weeks later, on March 2, 2021, Zaslav and Stankey met in person to continue discussing the possible Discovery/WarnerMedia combination.   After the meeting, Zaslav contacted Robert Miron, then Chairman of Discovery's Board of Directors, and Steven Miron. Zaslav inquired as to whether Advance/Newhouse would be willing to relinquish its rights to prevent a merger.  Robert and Steven Miron indicated that they would need additional details before deciding.  Zaslav also spoke with Discovery directors John C. Malone (who was also a major shareholder in Discovery with significant voting control and deep ties to other Discovery and WBD directors, including Zaslav and Advance/Newhouse), Paul A. Gould ("Gould"), and Discovery director Robert R. Bennett ("Bennett") about his meeting with Stankey.  (Registration Statement p. 190/674.)

55.     Advance/Newhouse owned preferred stock in Discovery – Series A-1 and Series C-1 – shares which, in combination, gave it the right to name three individuals to Discovery's Board of Directors.  The Series A-1 preferred shares also gave Advance/Newhouse veto rights

over mergers (the "Special Rights").  Stankey, however, expressed to Zaslav that AT&T would only be interested in a deal if the resulting business had a single class of common stock. (Registration Statement p. 190-191, 200/674.)

56.     Discussions between Discovery and AT&T continued to advance, with the companies entering into a non-disclosure agreement on March 30, 2021 to enable the exchange of information in connection with each party's evaluation of the proposed deal.  (Registration Statement p. 191/674.)  Two days later, on April 1, 2021, Zaslav, Stankey, and other senior managers from Discovery and AT&T met in person to continue discussions.  During this meeting, the parties discussed certain prospective financial information with respect to Discovery and WarnerMedia as well as their views as to the relative values of each business.  Following the meeting, Zaslav and other senior Discovery managers updated Robert Miron, Steven Miron, Gould and Bennett on their progress.  (Registration Statement p. 191/674.)

57.     On April 9, 2021, Discovery and AT&T provided each other with access to virtual data rooms for conducting due diligence.  (Registration Statement p. 192/674.)  Virtual data rooms are secure online repositories for document storage and distribution.  Virtual data rooms in high profile mergers such as this between WarnerMedia and Discovery typically include a comprehensive set of documents for the subject of the acquisition, including company financials, profit and loss statements and projections, tax returns and audits, business plans, product information, market research and competitive analysis, records concerning intellectual property, marketing plans and strategies, sales strategies, new product pipelines, technology investments, and board of directors' and their subcommittees' meeting minutes.

58.     In the case of a combination of two media businesses, the virtual data room would normally provide access to information about acquisition target (*i.e.*, WarnerMedia) including: (1)

information about the target's licensing revenue projections; (2) information about investments in new content development, including projected return on investment models; (3) information assessing the profitability of releasing movies directly to streaming services, as opposed to engaging in theatrical releases; and (4) detailed information on the target's overall cost and profitability history and projections.

59.     Over the next several weeks, due diligence and negotiations continued.  Ultimately, Discovery and AT&T agreed to terms whereby AT&T's shareholders would receive 71% of the outstanding shares of the combined company and Discovery shareholders would receive 29% of the outstanding shares and WarnerMedia would be acquired by Discovery with a debt of $43 billion.  (Registration Statement p. 5/674.)  The terms of the deal also required that there would only be a single class of the new company's stock; *i.e.*, there would be no preferred shares of WBD stock.  (Registration Statement pp. 205-206/674.)

60.     On May 16, 2021, Discovery's Board received a final presentation on the proposed transaction and approved the Merger.  Discovery and AT&T announced the Merger on May 17, 2021.  (Registration Statement p. 207/674.)  After having previously announced its spin-off of DirecTV to a private equity group in February 2021, the announcement of the Merger effectively signaled AT&T's withdrawal from the entertainment industry.

61.     Over the next seven months, the Merger was scrutinized by regulators in the United States and Europe.  On December 22, 2021, the European Commission cleared the proposed Merger of any antitrust concerns.  The United States Department of Justice approved the Merger on or about February 9, 2022.  In addition, the United States Internal Revenue Service scrutinized and approved the tax consequences of the Merger.

62.    On March 11, 2022, Discovery held a meeting for shareholders to vote on approving the Merger.  Over a quarter of a billion votes were cast in favor of the Merger.  The Merger closed on Friday, April 8, 2022, and WBD began trading on the NASDAQ on Monday, April 11, 2022.

**D.    The Merger Terms**

63.    The Merger was structured as a "Reverse Morris Trust Transaction" to enable the transfer of the WarnerMedia business to Discovery to be completed in a tax efficient manner.  It was executed through a series of seven steps (*see* Registration Statement pp. 182-184/674):

- First, AT&T transferred the WarnerMedia business and assets to a wholly-owned subsidiary of AT&T, named Magallanes, Inc. ("**Spinco**"), created for the sole purpose of effecting the separation of WarnerMedia from AT&T.

- Second, Spinco issued a combination of debt and cash instruments worth approximately $13 billion (subject to adjustment) to AT&T to purchase the WarnerMedia assets.

- Third, Spinco made a special cash payment to AT&T in consideration of the Merger worth approximately $30 billion, subject to adjustment.  Together with the $13 billion from the second step, this became the $43 billion in debt that Discovery agreed to assume from AT&T as part of the Merger.

- Fourth, Spinco issued all of its shares of Spinco common stock to AT&T.

- Fifth, AT&T distributed all of the Spinco common stock to AT&T shareholders on a pro-rata basis (*i.e.* in relation to stockholder's proportionate ownership of AT&T).

- Sixth, Discovery amended its corporate charter to convert its various classes of common and preferred stock into a single class of WBD common stock using the following conversion rates: (i) each share of Discovery's Series A, B, and C common stock was converted into a single share of WBD common stock; (ii) each share of Discovery's Series A-1 preferred stock was converted into 13.11346315 shares of WBD common stock; and (iii) each share of Discovery's Series C-1 preferred stock was converted into 19.3648 shares of WBD common stock.

- Seventh, a wholly-owned subsidiary of Discovery (now renamed Warner Bros. Discovery, Inc.) merged with Spinco, with Spinco surviving to become a wholly-owned subsidiary of WBD.  Each outstanding share of Spinco common stock from the fourth step automatically converted into 0.241917 shares of WBD common stock such that the holders of the prior Spinco shares that were now converted into

WBD common stock, owned approximately 71% of WBD's total outstanding shares, while those Discovery shareholders who obtained WBD common stock in the sixth step owned approximately 29% of WBD's outstanding shares.

64.      The net effect of the aforementioned steps was that holders of Discovery common stock acquired 1 share of WBD common stock in exchange for each share of Discovery common stock that they owned, and Spinco shareholders acquired 0.241917 shares of WBD stock in exchange for each share of Spinco common stock that they owned.

**E.      The Registration Statement, Prospectus and Other Offering Documents**

65.      On November 18, 2021, Discovery filed the first Form S-4 Registration Statement for the Registration of WBD common stock necessary to complete the Transaction, Registration No. 333-261188 (the "November 18, 2021 S-4").  The November 18, 2021 S-4 stated that the combined company intended to register:  (i) 1,702,536,808 shares of WBD common stock to be issued to holders of Spinco common stock upon completion of the transactions contemplated by the Agreement and Plan of Merger, dated as of May 17, 2021 (the "Merger Agreement"); and (ii) 695,402,358 shares of WBD common stock, which was expected to be the maximum number of shares of WBD common stock to be issued to holders of Discovery common stock.  The S-4 included a preliminary Proxy Statement/Prospectus to be issued to Discovery stockholders in connection with the Special Meeting of Discovery Stockholders to be held to vote on the proposed Transaction.

66.      The November 18, 2021 S-4 also incorporated various of AT&T's and Discovery's public SEC filings, including Annual Reports on Form 10-K for 2020 and Quarterly Reports on Forms 10-Q.

67.       On December 29, 2021, Discovery filed with the SEC Amendment No. 1 to the Form S-4 Registration Statement for WBD shares (the "S-4 Amendment No. 1").

68.     On January 24, 2022, Discovery filed with the SEC Amendment No. 2 to the Form S-4 Registration Statement for WBD shares ("S-4 Amendment No. 2").

69.     **The Registration Statement:**  Finally, on February 4, 2022, Discovery filed with the SEC Amendment No. 3 to the Form S-4 Registration Statement for WBD shares, (the "**Registration Statement**").  The Registration Statement contained a Preliminary Proxy Statement and Prospectus, also dated February 4, 2022.  This Registration Statement was declared effective by the SEC on February 10, 2022.

70.     The Registration Statement incorporated by reference the following documents: Discovery's Annual Report on Form 10-K filed on February 22, 2021 for the year ended December 31, 2020; Discovery's Definitive Proxy Statement on Schedule 14A filed on April 30, 2021; Discovery's Quarterly Reports on Form 10-Q filed on April 29, 2021 for the quarters ended March 31, 2021, June 30, 2021 and September 30, 2021; and Discovery's Current Reports on Form 8-K filed on February 11, 2021, February 19, 2021, April 20, 2021, May 17, 2021, May 20, 2021, June 10, 2021, June  16, 2021, July  1, 2021, July 20, 2021, October 14, 2021, December 22, 2021 and December 27, 2021.

71.     The Registration Statement also incorporated by reference (p. 351/674): "additional documents that Discovery may file with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act between the date of the proxy statement/prospectus and the completion of the Transactions.  These documents include Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as proxy statements."

72.     The Registration Statement was signed by Defendants Zaslav, Wiedenfels, Robert Miron and Steven Miron.  Defendants Steven Miron and Newhouse gave their consent to being named in the Registration Statement (and incorporated documents) as future Directors of WBD.

73.    **The Joint Proxy/Prospectus:**  On February 10, 2022, Discovery filed with the SEC the Joint Proxy Statement/Prospectus (the **"Prospectus"**).  The Prospectus states that it "forms a part of" the Registration Statement (p. 346/662).  The Prospectus also states (pp. 346-347/662) that it incorporates the following documents by reference: "Discovery's Annual Report on Form 10-K for the year ended December 31, 2020; Discovery's Definitive Proxy Statement on Schedule 14A filed on April 30, 2021; Discovery's Quarterly Reports on Form 10-Qs for the quarterly periods ended on March 31, 2021, June 30, 2021, November 3, 2021 and September 30, 2021.  The Prospectus also incorporated by reference Discovery's Reports on Form 8-K filed on February 11, 2021, February 19, 2021, April 20, 2021, May 17, 2021, May 20, 2021, June 10, 2021, June 16, 2021, July 1, 2021, July 20, 2021, October 14, 2021, December 22, 2021, December 27, 2021, February 7, 2022 and February 9, 2022."  The Prospectus further incorporated all SEC filings to be made by Discovery through the date the Merger closed on April 8, 2022.

74.    **The Spinco Information Statement:** Separately, Spinco filed with the SEC a preliminary information statement on Form 10 (File No. 000-56394) ("Form 10") as part of its registration of shares of Spinco ("Spinco common stock") that would be issued to AT&T and distributed to AT&T shareholders in the transaction (the "**Spinco Information Statement**").  The Form 10 was declared effective on March 28, 2022.  The Spinco Information Statement incorporated by reference the Registration Statement and the Prospectus.

75.    On March 28, 2022, Discovery filed with the SEC, pursuant to 17 C.F.R. § 230 462 (d), Post-Effective Amendment No. 1 to the Registration Statement.

76.    **Discovery's Form 424(b):**  On March 28, 2022, Discovery filed with the SEC a Form 424(b) in connection with the Registration Statement, pursuant to 17 C.F.R. § 230 424(b)(3) (the "**Form 424(b)**").  The Form 424(b) updated information contained in the Prospectus.

Specifically, the Form 424(b) contained updated financial results for fiscal year 2021 for both the WarnerMedia business and Discovery.  The Form 424(b) also included updated subscriber numbers for both HBO Max and Discovery+, which now were reported as 73.8 million and 22.0 million, respectively, as of December 31, 2021.  The Form 424(b) incorporated by reference (p. 323-324/648) the following documents:  Discovery's Annual Report on Form 10-K filed on February 24, 2022 for the year ended December 31, 2021; Discovery's Definitive Proxy Statement on Schedule 14A filed on March 14, 2022; and Discovery's Current Reports on Form 8-K filed on February 7, 2022, February 9, 2022, March 4, 2022, March 7, 2022, March 9, 2022, March 9, 2022, March 11, 2022 and March 15, 2022.

77.     **Amendment No. 2:** On April 8, 2022, Discovery filed with the SEC, pursuant to 17 C.F.R. § 230 462(b), Post-Effective Amendment No. 2 to the Registration Statement ("**Amendment No. 2**").  Discovery filed Amendment No. 2 "for  the sole purpose of registering an additional 35,000,000 shares of Series A common stock of WBD . . . for issuance in connection with the completion of the transactions contemplated by the Agreement and Plan of Merger, dated as of May 17, 2021."  The 35 million additional shares of WBD common stock were necessary because the exact exchange ratio, and therefore the number of shares that would be issued to Spinco shareholders in exchange for their Spinco shares, depended on the price of Discovery common stock as of April 8, 2022.  Therefore, Discovery did not know the exact number of WBD shares it would need to accomplish the transaction until just before the Merger closed.  Because AT&T and Discovery determined they required an additional 35 million shares under the terms of the Merger Agreement, these shares were issued pursuant to Amendment No. 2.

78.     Amendment No. 2 stated that Discovery "had previously registered an aggregate of 2,397,939,166 shares of WBD common stock by means of a currently effective Registration

Statement on Form S-4 (Registration No. 333-261188), as amended."  With the additional shares, in total Discovery registered 2,432,939,166 shares of WBD common stock.

79.     Amendment No. 2 incorporated by reference the Registration Statement and Prospectus (p. 2): "This Registration Statement incorporates by reference the contents of the Registration Statement on Form S-4 (Registration No. 333-261188), including all amendments supplements and exhibits thereto and all information incorporated or deemed to be incorporated by reference therein."

80.     Amendment No. 2 was signed by Defendants Zaslav, Wiedenfels, Robert Miron and Steven Miron.  Defendant Newhouse gave his consent to being named in the Registration Statement (and incorporated documents) as a future director of WBD.

81.     17 C.F.R. § 230 462 (b)(1) provides that a registration statement and any post-effective amendment thereto shall become effective upon filing with the SEC if the registration statement is for registering additional securities of the same class(es) as were included in an earlier registration statement for the same offering and declared effective by the SEC.

82.     17 C.F.R. § 230 464 (b)(1) of the Securities Act provides in relevant part that, "**with respect to securities sold on or after the filing date pursuant to a prospectus** which forms a part of a Form S-8 registration statement; or a Form S-3, F-2, or F-3 registration statement relating to a dividend or interest reinvestment plan; **or a Form S-4 registration statement** complying with General Instruction G of that Form and which has been amended to include or incorporate new full year financial statements or to comply with the provisions of section 10(a)(3) of the Act, **the effective date of the registration statement shall be deemed to be the filing date of the post-effective amendment**."[1]

---

[1] All emphases in quotations are supplied unless otherwise noted.

83.    For purposes of the claims herein asserted under Section 11 and Section 12(a)(2) of the Securities Act, the date the Registration Statement "became effective" is April 8, 2022, the date that Amendment No. 2, dated April 8, 2022, became effective.

84.    **The Offering Documents:** The Registration Statement, Prospectus, Spinco Information Statement, Form 424(b) and Amendment No. 2 are referred to herein as the "**Offering Documents**."

### F.    Certain Defendants' Financial Incentives for the Merger

85.    The Merger presented an opportunity for both Zaslav and Advance/Newhouse to profit.  Zaslav received an extra $338 million, including $100 million to be paid over five years simply if the Merger was consummated.  Advance/Newhouse received an extra $787 million from the Merger.

86.    From the germination of the idea of Discovery acquiring WarnerMedia, Zaslav always intended to run the combined company.  However, AT&T also made it a condition of the Transaction that Zaslav continue as CEO.  Thus, the first draft term sheet that AT&T presented to Discovery on April 27, 2021, included among its terms the requirement that Zaslav continue to serve as the CEO of the company that survived the Merger.

87.    Zaslav's employment agreement in effect in the Spring of 2021 would expire on December 31, 2023.  Under its terms, completion of the Merger would qualify as a "change in control" and therefore trigger a clause that would allow Zaslav to "terminate his existing employment agreement and receive a cash severance payment along with accelerated vesting of certain of his equity awards."  This coupled with the terms that AT&T presented to Discovery requiring Zaslav to continue his role as CEO following the Merger allowed Zaslav to "name his price" for the consummation of the deal.

88.     Using his leverage over the Merger, Zaslav negotiated a new employment agreement (to be effective upon the signing of the Merger Agreement) for a four-year extension of his existing contract (through 2027), with a total compensation package valued at **$503 million**. Of this amount, **$338 million** represented **additional** value he received from the Merger.

89.     Zaslav negotiated a special term that would award him $100 million simply if the Merger closed.  According to documents produced in *Monroe County Employees' Retirement System et al. v. Warner Bros. Discovery, Inc.*, C.A. No. 2022-1115-JTL (Del. Ch.) (the "*Monroe Action*"), the $100 million number was selected because it was the same amount that Robert Iger received in connection with Walt Disney Company's acquisition of the entertainment assets of 21st Century Fox.

90.     Taking into consideration Zaslav's original employment agreement as well as his newly-negotiated employment agreement, Zaslav's compensation package is broken down as follows:[2]

| Year | Salary | Bonus[3] | Restricted Stock Units | Stock Options | Merger Incentive Award | Total |
|------|--------|----------|------------------------|---------------|------------------------|-------|
| 2021 | $3 | $22 | $12 | $18 | $20 | **$75** |
| 2022 | $3 | $22 | $12 | $18 | $20 | **$75** |
| 2023 | $3 | $22 | $12 | $36 | $20 | **$93** |
| 2024 | $3 | $22 | $12 | $18 | $20 | **$75** |
| 2025 | $3 | $22 | $12 | $18 | $20 | **$75** |
| 2026 | $3 | $22 | $12 | $18 | - | **$55** |
| 2027 | $3 | $22 | $12 | $18 | - | **$55** |
| Total | $21 | $154 | $84 | $144 | $100 | **$503** |

91.     Advance/Newhouse was involved in the negotiations between the Discovery Board and Zaslav over the terms of his new employment agreement.  Robert Miron was the Chair of the

[2] All dollar amounts are in millions.
[3] After 2021, Zaslav's bonus had the potential to be increased up to 125% of the target $22 million, or $27.5 million.

Board Compensation Committee that was responsible for negotiating and recommending changes to Zaslav's employment agreement. Despite not being a member, Steven Miron also attended the meetings of the Board Compensation Committee on May 6, 8, 9, 10, 11 and 12, 2021, during which the committee discussed the proposals, approved offers and responses to Zaslav's demands, and ultimately recommended the new agreement.

92.     Like Zaslav, Advance/Newhouse had powerful leverage during the negotiation of the Merger.   At the time of the Merger, Advance/Newhouse held approximately 23% of Discovery's aggregate voting power and also owned all outstanding shares of Discovery's Series A-1 and Series C-1 preferred stock.   Terms associated with these preferred shares gave Advance/Newhouse special rights, including the right to veto any material amendment to Discovery's certificate of incorporation, any merger or similar transaction involving Discovery, or any reclassification of Discovery's equity interests.   These terms also gave Advance/Newhouse the ability to block the Transaction, and its consent was required for the Merger to occur.

93.     Advance/Newhouse had three designees on Discovery's Board – Steven Miron, Robert Miron and Susan M. Swain – as well as Newhouse who was an "observer."  Through these individuals, Advance/Newhouse received regular updates on the status of the deal, received and reviewed due diligence information, participated in Board discussions of the benefits and detriments of the Transaction, spoke with Discovery's financial advisors and learned of the status of the negotiations as they progressed.

94.     Advance/Newhouse was thus privy to confidential information regarding the Merger, including a presentation given by Zaslav and other senior management on April 21, 2021, that covered, among other things, the "strategic benefits of combining Discovery with the WarnerMedia Business."  Advance/Newhouse representatives also took part in several meetings

of Discovery's Board and the Board's subcommittees where the Merger was discussed. Specifically, Robert Miron was present at the April 23, 2021 meeting of Discovery's Executive Committee; Steven Miron, Robert Miron, Swain, and Newhouse were present at the April 27, May 9, May 11, May 12, and May 16,  2021 meetings of the Discovery Board; Steven Miron, Robert Miron and Swain were present at the April 30, 2021 meeting of the Discovery Board; and Steven and Robert Miron were present at the May 6, 7, 8, 9, 10, 11, and 12, 2021 meetings of Discovery's Compensation Committee.

95.     One of the meetings where Advance/Newhouse representatives were present was the April 30, 2021 meeting of the Discovery Board, when the Board approved the economic terms of the Merger and authorized Discovery's management to enter into definitive agreements with AT&T based on those terms.  During the meeting, the need for Advance/Newhouse to approve the Merger was also discussed.  As noted above, Advance/Newhouse's three Board members, including Steven Miron, were present during the meeting.

96.     As the negotiations progressed, and the terms and price of the offers and counter-offers were discussed, Advance/Newhouse told Discovery's counsel, advisors and Board that it had not yet determined whether or not it would support the Merger.  Advance/Newhouse waited until the eleventh hour of negotiations to engage in serious discussions concerning its blocking rights, thus maximizing its leverage over consummation of the Merger.

97.     On April 30, 2021, the day that the Discovery Board approved the core terms of the Merger, representatives of Advance/Newhouse called Zaslav and threatened to block the deal.  As explained in the Registration Statement (p. 195/674), Advance/Newhouse told Zaslav that "while Advance/Newhouse would be willing to consider supporting the proposed transaction depending on its terms, Advance/Newhouse would not be prepared to approve the proposed transaction unless

Advance/Newhouse was appropriately compensated for the relinquishment of the Special Rights as part of the proposed transaction."  Advance/Newhouse thus used their Special Rights to hold the Merger hostage unless they received a large extra payment.  Advance/Newhouse initially told Zaslav that it wanted a $2 billion premium over the amount it would otherwise receive for exchanging its Discovery shares in the Merger in order to allow the Merger to proceed. (Registration Statement, pp. 205-206/674.)   Even after Discovery and AT&T had completed negotiating the complete terms of the Merger, Advance/Newhouse continued to withhold their approval of the Merger in order to extract a greater profit.

98.     Advance/Newhouse's strategy was successful.  Following negotiations with an ad-hoc transaction committee, Advance/Newhouse agreed on May 16, 2021 – the same day that Discovery's Board of Directors was scheduled to hold its final vote to approve the Merger, and a day before the Merger was to be publicly announced – to allow the Merger to proceed in exchange for a 31.3% premium – or **$787 million** – above what it otherwise would have received for its Series A-1 preferred shares.   This was achieved by Discovery agreeing to convert each of Advance/Newhouse's Series A-1 preferred shares into 13.11346315 WBD shares instead of the 9 shares that the Series A-1 preferred shares were entitled to receive under their terms.   Further, Advance/Newhouse was given the right to name two of the six directors that Discovery had the right to appoint to the initial WBD Board of Directors.

### G.     The Announcement of the Merger

99.     On May 17, 2021, AT&T and Discovery held a joint press conference to announce the Merger and discuss it with investors (the transcript was filed by Discovery with the SEC as a prospectus on the same day).  Stankey, Wiedenfels and Zaslav all participated.

100.     During the press conference, it was announced that Zaslav would lead the new company and that the Merger was expected to close in the middle of 2022.  Zaslav told AT&T and

Discovery investors that he expected that the new combined company would generate $52 billion in revenue in 2023 (with at least $15 billion stemming from the direct to consumer business), $14 billion adjusted EBITDA, and $8 billion in free cash flow (a 60% free cash flow conversion rate).

101.    The new company would have a total of $55 billion of debt, and the ability to service the debt concerned investors.  Zaslav thus assured them that the new company would be a "free cash flow machine."  During the May 17, 2021 joint press conference Zaslav added: "[W]e will have over $15 billion in direct to consumer, but over $8 billion in free cash flow.  So, you'll see that leverage . . . come down very quickly . . . . We're starting with $20 billion [annual investment in content] and we want to invest in more.  $20 billion is what we spend now together . . . and it's a very efficient model, I think about 60%.  You see we got $14 billion in EBITDA in '23, and we're expecting more than $8 billion in free cash flow."

102.    This guidance was reiterated in the Offering Documents, *e.g.*, on page 227/674 of the Registration Statement and on page 224/662 of the Prospectus.  Both documents also contained guidance on revenue, EBITDA, free cash flow for the combined company (WBD) for fiscal years 2021-2025.  Notably, Discovery's management case projected $49.2 billion in revenue and $6.1 billion in free cash flow for fiscal year 2022.

103.    Throughout the year-long due diligence process for the Merger, Discovery management continued to reaffirm its confidence in its initial free cash flow, revenue and EBITDA guidance and positive outlook for WBD, and emphasized the new company's potential to generate free cash flow.

104.    Analysts and investors focused on a few aspects of the Merger.  Notably, WBD would have a total of $55 billion in debt, and free cash flow was a critically important metric.  WBD would need to be generating sufficient cash to pay down that debt.  More specifically,

analysts looked to WBD's ability to generate enough revenues to offset the considerable costs that were associated with generating new content.  Furthermore, consumer preferences were shifting toward streaming services, and investors and analysts focused on the number of subscribers to the various streaming apps under WarnerMedia (HBO Max) and Discovery (Discovery+).

105.    Certain streaming services, such as Netflix, had spent considerable sums to develop new content in order to grow their subscriber bases.  Thus, investors were also interested to know what the new company's plan would be for new content production as a component of its overall streaming strategy.  For example, during Discovery's third quarter earnings call held on November 3, 2021, Credit Suisse analyst Doug Mitchelson asked, "Can you talk about the content vision for the combined company and how that's evolving? . . . [I]s Warner Bros investing enough in content under AT&T while they're focused on the merger, how are you thinking about how much content spend should be to win in global streaming versus how much the companies are spending today?"  Wiedenfels replied that a significant increase in content spend on each side of the transaction had already been baked into WBD's financial guidance:  "We scrutinize sort of each other's investment plans as part of the deal discussions and as we've said before all the financial guidance that we've given around the deal is always assuming a pretty significant step up in terms of content investments over the coming years."

106.    During Discovery's fourth quarter earnings call on February 24, 2022, RBC analyst Kutgun Maral asked, what gave Discovery "confidence that that the DTC spend levels embedded in your spend targets remained appropriate" in an "increasingly competitive streaming landscape."  Maral said he wanted to better understand to what extent driving free cash flow and meeting EBITDA guidance took precedence over "maybe some flexibility in incremental streaming investments to better position [WBD] to become a longer-term leader in the space."  In response,

Zaslav emphasized that the new company would seek to "compete with leading streaming services, not win the spending war."  Zaslav added that "with IP ownership across a highly monetizable collection of IP.  Perhaps most importantly, we are not solely dependent on one business model. As we reach across multiple platforms and touchpoints, every leg of the stool from linear to direct to consumer to content production and monetization."

107.    During the same earnings call, in response to a question from Credit Suisse analyst Doug Mitchelson regarding whether management's confidence in WBD's guidance for fiscal year 2023 had evolved from when it was first communicated to investors when the Merger was announced and in early iterations of the registration statement, Wiedenfels replied, "yes, full confidence in the guidance that we gave when we announced this deal.  Again, as you know, we're in an approval process here.  So, we have done some more work, but are eager to get into the detailed planning of these synergies after closing.  But again, everything we've learned so far has, if anything, given me more confidence on our ability to generate these numbers."

108.    The Registration Statement also emphasized the monetization of WarnerMedia's extensive intellectual property portfolio, and the increased cash flow that those assets could bring to Discovery once the Merger became effective.  For example, the Registration Statement (p. 208/674) stated that one of Discovery's reasons for the Transaction included the fact that Discovery expected "the [t]ransactions to generate increased free cash flow, which it expects will initially be used to reduce leverage and subsequently be available to fund additional strategic growth investments and to return capital to WBD stockholders:"

## VIII.   THE OFFERING DOCUMENTS WERE FALSE AND MISLEADING

109.    The Offering Documents contained a series of false and/or misleading statements. These false and misleading statements are set forth in context below.

A.     **The Offering Documents' Representations About the Number of HBO Max Subscribers Were False and Misleading**

1.   **The Importance of Streaming Subscribers to Investors**

110.    As stated in paragraphs 5, 38-44 and 47-48, above, both WarnerMedia and Discovery were focused on growing their subscriber base.  Information about the number of HBO Max's subscribers was important to investors.  A *Financial Times* article dated January 10, 2022, titled "HBO Max tries to close gap with Netflix and Disney in streaming wars," reported that Kilar, WarnerMedia's CEO, stated that the HBO Max streaming service "broke through" in 2021 and earned a seat with Disney and Netflix as a leader of the streaming wars.  In fact, HBO Max lagged behind.  WarnerMedia reported that it had 74 million subscribers to HBO Max and HBO at the end of 2021, up from 61 million as of the end of 2020.  By contrast, Netflix and Disney had reported 214 million and 118 million subscribers, respectively, at the start of October 2021.

111.    Stankey sought to reassure investors who were skeptical that HBO Max would ever become a formidable competitor to Netflix and Disney+.  During an investor day presentation on March 11, 2021 Stankey announced that AT&T now expected between 120 million and 150 million worldwide HBO Max and HBO subscribers by the end of 2025. This was a significant increase from the 75-90 million subscribers that AT&T had projected in October 2019.

112.    When the Merger was first announced, analysts and media industry commentators focused on the potential combined subscriber count (HBO Max and Discovery+) as evidence that WBD would become a viable streaming competitor, because the existing subscriber base of the new company's DTC products equaled "almost 100 million subscribers."  This triple digit number was important, as it would poise WBD to become the third largest streaming company in terms of subscriber numbers (behind Netflix and Disney+).  An article published in *Indie Wire* (an online publication covering the film and television industry) on March 16, 2022 stated that in acquiring

HBO Max's 73.8 million subscribers, Discovery's modest number of 22 million subscribers would "sky rocket."

113.    An analyst report authored by Barclays analyst Kannan Venkateshwar published on April 8, 2022 stated, "If we assume HBO's subscriber growth guidance from 2021 remains valid post deal and limited overlap between Discovery+ and HBO Max subs (HBO guided 120-150mm by 2025), then Discovery could have more streaming subs than Disney+ at an ARPU higher than Disney+."

114.    An article dated April 6, 2022 in *Axios* by Tim Baysinger, titled, "Project Popcorn Defines Jason Kilar's WarnerMedia Legacy," stated that Kilar's "Project Popcorn helped HBO Max reach its subscriber goals ahead of schedule," and that "when [HBO Max] combines with Discovery+, it will be comfortably among the big players alongside Netflix and Disney."

115.    During the joint press conference announcing the Merger on May 17, 2021, Zaslav embraced WarnerMedia's streaming focus, and proclaimed that the new company's focus was "going to be to get to 200 million, 300 million subscribers."  Zaslav added that, "[w]e're almost at 100 million now."

116.    In an interview with Zaslav published by *Variety Magazine* on December 8, 2021 (titled "How David Zaslav Plans to Combine Discovery and WarnerMedia to Unleash 'Shock and Awe' on the Streaming Wars"), Zaslav said his vision for the combined company was to get "to the Holy Grail of 200 million-250 million global subscribers — with a suite of streaming services that include HBO Max, Discovery Plus and CNN Plus."

117.    During the Goldman Sachs Communicopia conference on September 21, 2021, Zaslav went further and stated that "… I think what differentiates [WBD] and gives it so much diversified strength is if we are able in this go-to-market strategy, if we're here two years from

now, we're able to grow this product globally if we are able in this go-to-market strategy, if we're here two years from now, we're able to grow this product globally to 200 million subscribers or three years from now."

118.     After the Merger closed on April 8, 2022, Argus analyst Joseph Bonner noted in a report dated April 13, 2022, that "the key asset" for Discovery "in the acquisition was the HBO and HBO Max cable channel/video streaming service" and that investors would "be closely tracking the company's subscriber acquisition metrics for any sign of increasing or diminishing traction."

119.     During WBD's April 26, 2022 earnings call to discuss earning results for the first quarter of 2022 (its first as a publicly traded company), Zaslav estimated the current universe of HBO, HBO Max and Discovery subscribers to be almost 100 million subscribers.  He emphasized that WBD had, "the ability to ring any number of cash registers theatrical, gaming, premium home video, Pay TV and free-to-air broadcast. Plus streaming now with a 100 million collective subscribers, it is a growing and important complement to these existing and traditional avenues of monetization, and represents true optionality that over time will drive our strategic decision-making."

## 2.  Misrepresentations About Subscriber Numbers

120.     The Offering Documents made the following specific representations about the number of subscribers:

    a.   The Registration Statement (pp. 127/674, 165/674, 166/674) and Prospectus
         (pp. 124/662, 162/662, 163/662) stated that "**the total subscribers for
         HBO and HBO Max was 69.4 million as of September 30, 2021**."  In
         addition, the Registration Statement (p. 121/674) and the Prospectus (p.
         108/662) stated that Discovery's total subscribers were 20 million as of

36

September 30, 2021.  Thus, **the Offering Documents reported a total of 89.4 million subscribers for WBD's direct to consumer offerings as of September 30, 2021**.

    b.    The Form 424(b) (pp. 96/648, 131/648, 132/648) reported that the total subscribers for HBO and HBO Max was 73.8 million as of December 31, 2021.  This was a substantial – 6% – increase in just three months.  The Form 424(b) (p. 90/648) also stated that as of December 31, 2021 Discovery's total subscribers were 22 million.  **Therefore, as of March 28, 2022 (the date the Form 424(b) became effective), the Offering Documents had reported a total of 95.8 million subscribers for direct to consumer offerings of WBD as of December 31, 2021.**

121.    In fact, these subscriber numbers were materially misleading because they included 10 million non-paying HBO and HBO Max subscribers who had not activated their accounts and "non-core" Discovery subscribers.  After the Merger closed, WBD revised the numbers reported in the Offering Documents down by 10 million.

122.    The Offering Documents explained that WarnerMedia included the following as HBO Max and HBO subscribers:

> HBO Max—Wholesale: accounts that have access to HBO Max through a wholesale distributor (**including wholesale subscribers and subscribers receiving access through bundled services that may not have signed in**), (b) HBO Max—Retail: accounts that have access to HBO Max and are billed directly by WarnerMedia or by a third party via in-app purchase, (c) HBO: accounts that do not have access to HBO Max, and (d) HBO Commercial: commercial accounts that do not have access to HBO Max and are billed on a bulk basis (*e.g.*, hotels, etc.).  Domestic HBO Max and HBO subscribers do not include free trials or Cinemax subscribers.

123.    The Offering Documents never quantified the number of "subscribers receiving access through bundled services that they may not have signed in."  These were non-paying "subscribers."  Thus, investors did not know how many – if any – of the 69.4 million (as of September 30, 2021) and 73.8 million (as of December 31, 2021) HBO and HBO Max subscribers had received their service as part of a bundled deal with AT&T and never signed into the services, and were thus non-paying subscribers.

124.    During the August 4, 2022 earnings call, after the market closed, Wiedenfels stated,

[W]e are changing the way we present our D2C subscriber numbers going forward to align our subscriber definitions across the legacy Discovery and WarnerMedia businesses.  Starting with the paying subscriber count reported on our Q1 earnings call of roughly 100 million subscribers, **we have made the following key adjustments that totaled 10 million subscribers.  First, the HBO Max subscriber number historically included certain unactivated subscribers under the AT&T Mobility distribution agreement.  Consistent with legacy Discovery policy, we will exclude such unactivated subscribers going forward.**  Second, as JB detailed, we have refined our strategy with a clear focus on one combined D2C product.  As such, going forward, we will exclude non-core D2C subscribers outside of the Discovery+ or HBO Max products from our account, such as subscribers of MotorTrend, Eurosport Player and a few smaller other products.

125.    The failure to report the number of HBO Max subscribers that had included unactivated (*i.e.*, non-paying) subscribers rendered misleading the Offering Documents' reports of subscriber numbers.  WBD admitted this during the August 4, 2022 earnings call after the market closed, when Jean-Briac Perrette, WBD's Chief Executive Officer and President of Global Streaming and Games explained the that "**[t]he goal**" of removing 10 million subscribers from the previously reported subscriber counts was "**to provide you with a clear and transparent number of true paying subscribers to our core service**."

126.    Reporting that HBO Max had 73.8 million subscribers, and that Discovery had 22 million subscribers as of December 31, 2021, without disclosing that 10 million of these

subscribers were either non-paying HBO Max subscribers or were subscribers to services that Discovery considered "non-core," rendered the reported subscriber numbers misleading.  In fact, **ten percent** of the subscribers that were communicated to investors as of April 8, 2022, the date that Post-Effective Amendment No. 2 became effective, should not have been included, either because they were non-paying subscribers (in the case of HBO Max) or they were "non-core" and would later be excluded (in the case of Discovery).

### 3.   The Reaction of the Market to the Changed Subscriber Numbers

127.    Analysts and investors were surprised and disappointed at WBD's revision to its previously disclosed subscriber numbers.  Subscriber counts were critical, and investors had been optimistic that the combined subscriber counts under the WarnerMedia and Discovery umbrellas would allow it to compete with Netflix and Disney.

128.    In reaction to the news that WBD had "revised its assessment of its current streaming base to 92.1 million," Benchmark analyst Matthew Harrigan stated in a report dated August 5, 2022, that WBD's "DTC segment intermediate ambitions" were "somewhat deflating." Rosenblatt analyst Baron Crockett remarked in a report dated August 5, 2022 that "EBITDA and DTC subs" were starting out "10% lower than telegraphed" and that "global subs are seen hitting 130 million by 2025 . . . but we had been estimating 167 million subs by then."

129.    Barclays wrote in its analyst report dated August 5, 2022 that, "[t]he company re-based HBO numbers from @100mm at the end of Q1 to 90mm as AT&T was apparently counting HBO subs who got the service as part of a distribution bundle but never activated the account. . . . From this rebased number, the company expects to grow to 130mm subs by 2025." Following the quantification of the subscriber numbers in the August 4, 2022 call, JP Morgan reported that it "expect[ed] the revenue associated with never-activated AT&T customers to degrade fairly quickly."

130.    WBD's disclosure on August 4, 2022 that it now only expected to have 130 million subscribers by 2025 was a significant reduction to Zaslav's guidance at the outset of the Merger of 200 million subscribers, and analysts recognized the larger implications.  The WBD streaming service, or a combination of HBO Max and Discovery+, would not, in fact allow WBD to compete on the same level as Netflix and Disney+.  Wolfe analyst Peter Supino noted that Discovery's reset of its global DTC subscriber target of 130 million instead of 200 million by year end 2025 meant that "WBD is likely not competing at the level of DIS and NFLX globally."  Argus analyst Joseph Bonner noted in a report published on August 13, 2022 that WBD would need to "step it up" in terms of its subscriber acquisition metrics if the company expected to compete at scale in the streaming business.

131.    The continued growth of combined subscriber numbers, particularly HBO and HBO Max subscriber numbers, was critically important to investors, since Discovery+ had a far more modest number of subscribers at the close of the Merger.  At least 7.2 million of the 10 million subscribers that were no longer being counted were HBO and HBO Max subscribers that had not activated their accounts.  The amount of the 10 million that could have come from Discovery's "non-core" programming – Eurosports Player, Motortrend and Discovery Kids – could at most have been 2.8 million.  Discovery had reported that Eurosports Play had 1 million subscribers in February 2018, which then added another 500,000 subscribers during the 2018 Olympics.  Motortrend and Discovery Kids are estimated to have approximately 200,000 to 300,000 subscribers each.  Therefore, even if **all of** Discovery's non-core programming was non-paying (which was not the case) the total subscriber counts that are **not** attributed to HBO and HBO Max could be no more than 2.8 million.

**B.      The Offering Documents Were False Because They Failed to Disclose that WarnerMedia Had "Halted" Licensing Its Content**

**1.      The Importance of Content Licensing to WarnerMedia's Business**

132.    A significant portion of WarnerMedia's revenues came from licensing its content to third parties.  In AT&T's Form 10-K for the fiscal year ended December 31, 2021, filed on February 16, 2022 with the SEC, AT&T reported that WarnerMedia's "content and other" revenues for 2021 were $13.514 billion.  "Content and other" revenues are comprised largely of revenues from licensing WarnerMedia content to third parties.  (The other two categories of reported revenues are "Subscription" and "Advertising.")  Total revenues for WarnerMedia were $35.623 billion.  Thus, the "content and other," *i.e.*, licensing revenues, were 38% of the WarnerMedia segment's overall revenues for 2021.

133.    Analysts understood the importance of licensing revenues.  Barclays wrote on August 5, 2022 that to "maintain stability" in the WarnerMedia business, "the company may have to grow licensing revenues even more aggressively as demand for content slows due to major streamers like Netflix."

**2.      Misrepresentations About Content Licensing**

134.    The Offering Documents did not disclose that WarnerMedia had halted licensing its content to third parties in favor of providing its content solely on the HBO Max streaming service.  The failure to disclose this material fact rendered the following statements in the Offering Documents (specified in paragraphs 135, 139, and 142 below) false and misleading.

135.    **First**, the Registration Statement (p. 126/674) stated: "The television and film programming content that the WarnerMedia Business produces is also licensed to third parties for use as part of their various video services and platforms."  This statement was also made in the Prospectus (pp. 122-123/662) and in Form 424(b) (pp. 95/648).

136.    This statement was materially misleading.  It omitted that WarnerMedia had changed its business strategy to stop licensing its content to third parties, instead just delivering its content on HBO Max.  Thus, even if WarnerMedia content was still available from third-party providers under pre-existing licensing contracts, the strategy had shifted.  Investors reading the statements in the Offering Documents would not have understood that WarnerMedia had made changes to its lucrative practice of licensing its content to a wide variety of third-party service providers, including non-affiliated digital distributors.  Instead, the WarnerMedia business had embarked on a strategy to make its content exclusive to its own delivery systems, and in particular its HBO Max streaming service.  This information was material to investors.

137.    The change to WarnerMedia's content licensing was only disclosed after the Transaction was consummated.  During WBD's earnings call for the second quarter of 2022 on August 4, 2022, Wiedenfels explained the $2 billion decline in EBITDA and decline of $49 million, or 25%, in WarnerMedia's revenues from third quarter 2021 to third quarter 2022 by the fact that before the Merger, WarnerMedia had "halted" content licensing. Wiedenfels stated that there had been "significant reductions in external content sales" at WarnerMedia, *i.e.*, "**new content licensing deals to third parties were largely halted and content was, in general, made exclusive to HBO Max**."  He further stated that "certain actions taken to limit HBO Max B2B distribution provided a headwind to performance."

138.    The shift to "halt" the licensing of WarnerMedia content to third parties and provide that content "exclusive[ly] on HBO Max" was one of the reasons that Wiedenfels cited for the $2 billion downward adjustment to full year 2022 EBITDA.

139.    **Second**, the Registration Statement (pp. 122-123/662), Prospectus (P. 88/662) and Form 424(b) (pp. 74-75/648) in the "Risk Factors" section, stated:

**Failure to renew, renewal with less favorable terms, or termination of the WarnerMedia Business's content licenses and similar distribution agreements may cause a decline in WBD's revenue.**

Because the WarnerMedia Business's content is licensed to and distributed through third parties, such as theatrical exhibitors (and in certain international territories, local theatrical distributors), traditional television and pay-TV broadcasters and operators of digital platforms, which in turn make such content available, directly and indirectly, to consumers, **WBD will be dependent upon the maintenance of such licensing and distribution agreements with such third parties**. These agreements generally provide for the scope of licensed rights, including geographic territory, exploitation rights, holdbacks and/or other restrictions, including exclusivity or non-exclusivity, window(s) of exploitation (including first and second pay-TV and free to air broadcast), **and for payment of a license fee to WBD** based on a number of factors, including the scope of the rights granted, the popularity of the content . . . and the date of its first theatrical or pay-TV exhibition.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

**Changes in distribution strategy** and variations on traditional theatrical distribution and other licensing models, such as shortening traditional windows or making simultaneous the availability of certain films theatrically and on-demand, and other hybrids, **may also drive changes in the licensee fees** that theatrical exhibitors and distributors and other downstream licensees in the value chain may be willing to pay for content, which may in turn negatively affect WBD's content revenue.

140.    These statements were materially misleading.  They omitted that WarnerMedia had "largely halted" licensing its content to third parties prior to the close of the Merger.  This omission rendered the statements made above misleading because:

        a.    Representing that the merged company (WBD) "would be **dependent** upon the maintenance of such licensing and distribution agreements with third parties" without disclosing that the WarnerMedia had **already "largely halted"** the practice of entering into such agreements led investors to believe that WBD was fully engaged in maintaining and developing its licensing agreements.

b. Representing that "[c]hanges in distribution strategy" "**may** also drive changes in the licensee fees," when the distribution strategy had **already** changed and had **already** reduced its licensing fees misled investors to believe that WBD had not changed its distribution strategy.

141.   Wiedenfels later revealed on August 4, 2022 that there was a "corporate initiative to prioritize HBO Max growth globally," which **had in fact resulted in WarnerMedia's decision to make its content "exclusive to HBO Max**."  This was, therefore, a "change in distribution strategy" which had already occurred, and investors should have been (but were not) made aware of that fact.

142.   **Third**, during Discovery's fourth quarter earnings call held on February 24, 2022, Zaslav said the following regarding WarnerMedia's monetization and distribution of its content:

> As one of the leading content arms dealers in the industry, Warner Brothers television is formidable.  And as a company we will also be uniquely positioned to better serve advertisers and distributors globally. Said another way, we can monetize across any number of different cash registers.  **Consider that Warner Brothers television has over 100 active series being sold to over 20 platforms and outlets**.  **It's a content maker and content owner generating significant revenue, free cash flow** and most importantly, optionality.

143.   This statement was false and misleading because, in fact, WarnerMedia had "largely halted" content media deals, making its content less widely available than it had been previously.

144.   This statement by Zaslav constituted a "prospectus" for purposes of Section 12(a)(2) of the Securities Act because it was transcribed and filed with the SEC as a written communication made in connection with and relating to the Merger pursuant to 17 C.F.R. § 230.425.

145.    Analysts were surprised by the announcement that WarnerMedia had halted its content licensing.  For example, Cowen reported on August 5, 2022 that "management identified a half-dozen areas driving the shortfall" in EBITDA projections, and listed "(1) reductions in external content sales in favor of HBO Max exclusivity, (2) limited HBO Max B2B distribution, (3) substantial investments in animated/kids content without a compelling business case, (4) substantial investments in direct-to-consumer ('DTC' or 'D2C') films without a compelling case, (5) substantial investments in content for Turner without a compelling business case and (6) higher than expected corporate expenses transferred from AT&T."

**C.    The Offering Documents Were False Because They Failed to Disclose That WarnerMedia Failed to Develop an "Investment Case" Before Pouring Billions into New Content Development**

146.    Development of new content was a critical piece of WarnerMedia's plan to drive new subscribers to HBO Max.  It was also very expensive.

147.    WarnerMedia's decision to invest heavily in new content development was apparent from its financial statements.  In its 10-K for the fiscal year ended December 31, 2021 (p. 59/200), filed on February 16, 2022 with the SEC, AT&T reported that WarnerMedia's programming costs were $15.286 billion, up from $11.678 billion in 2020 and $13.949 billion in 2019.  These costs were significant, comprising 53.8% of WarnerMedia's total costs for 2021.  The allocation of these costs – and any potential return on these investments – were therefore material to investors.

148.    Typically, before significant investments are made in new content development, a content producer will determine the type of return on investment it can expect from the project.  Without this information, producers cannot determine, for example, whether, in the case of films, to pursue a theatrical release or send them straight to streaming services.  Metrics such as profit, revenue and the overall value of the enterprise cannot be determined without performing this

return-on-investment analysis.  Content producers also use this information in helping formulate projections.

149.    A return on WarnerMedia's new content investments was also particularly important to investors, who were hyper-focused on WBD's free cash flows.  WBD had debt totaling $55 billion following the Merger, and having sufficient cash to pay that down was essential.

150.    When the Merger was announced, Discovery projected that WBD would generate $6 billion in free cash flow for 2022 and $8 billion for 2023.  However, WarnerMedia's multi-billion-dollar investments in new content made before the Merger eroded WBD's free cash flow because WarnerMedia had not conducted return-on-investment analyses to determine that the investments were financially sound.

151.    During WBD's earnings call for the first quarter of 2022 on April 26, 2022, Wiedenfels disclosed that WarnerMedia had undertaken expensive projects without first determining the profitability of those projects.  In particular, he stated, "I'm working very closely with our creative and financial leadership teams **to examine the totality of our $23 billion plus of annual content spend to analyze the ROI of each dollar spent**."  He further stated, "**there's a lot of chunky investments that are lacking what I would view as a solid analytical, financial foundation and meeting the ROI hurdles that I would like to see for major investments**."

152.    During WBD's earnings call for the second quarter of 2022, on August 4, 2022, Wiedenfels disclosed that WarnerMedia had invested substantial amounts in developing new content without an adequate investment case.  Specifically, he attributed the EBITDA shortfall to (1) "substantial investment in kids and animation content for both linear and D2C platforms **without an adequate investment case** against them;" (2) "substantial investments in direct to

46

HBO Max films, for which, again, **we did not find sufficient support**;" and (3) "significant incremental and loss-making content investments for the Turner networks."  He further cited, "[s]pecifically, **content spend on shows that did not have a path to generate sufficient ratings or incremental monetization potential**" as a reason for revising WBD's EBITDA down by $2 billion in 2022.  In summary, Wiedenfels told investors that WarnerMedia had been overspending on developing new content without a return on investment justification.

153.    Because WarnerMedia failed to conduct a proper return on investment analysis before committing billions of dollars to new content, WBD was forced to cancel movies in production and shows before they were released.  For example, WarnerMedia had been touting the summer theatrical release of "Batgirl," but this was canceled shortly before its release, even though production had neared conclusion.  As a result, shortly after the Merger closed, WBD canceled a total of 36 shows that had been in development at HBO after having determined that there had never been a business reason to launch these programs.

154.    Additional content that was canceled due to the lack of an investment case were certain films that had been produced to be released directly to HBO Max.  According to an article published in *Variety* magazine on August 3, 2022, WBD subsequently removed such films as: "Moonshot," a sci-fi rom-com starring Lana Condor and Cole Sprouse; an artificial-intelligence dystopia comedy which had premiered just three months prior called "Superintelligence," starring Melissa McCarthy; Robert Zemeckis' 2020 remake of "The Witches," starring Anne Hathaway, Octavia Spencer, Stanley Tucci and Chris Rock; "An American Pickle," starring Seth Rogen as an immigrant who wakes up after being pickled for 100 years; a Doug Liman heist film called "Locked Down" with Anne Hathaway and Chiwetel Ejiofor; and a drama titled "Charm City Kings" by director Angel Manuel Soto.

155.    The following statements in the Offering Documents were false and misleading.

156.    **First**, the Registration Statement (p. 168/674) and Prospectus (pp. 165-166/662) reported that costs at HBO had increased in 2020, as compared to 2019.  Specifically, they stated that although WarnerMedia had experienced reduced cost of revenues in 2020, "[t]hese operating expense declines were partially offset by film impairment charges incurred in 2020 and **increased HBO costs due to approximately $1,800 [*i.e.*, $1.8 billion] of programming investment related to HBO Max** – which began to be amortized in 2020 – as well as incremental production shutdown costs."

157.    The disclosure that WarnerMedia had spent $1.8 billion on programming as an investment in HBO Max was misleading because it omitted that WarnerMedia had not done an ROI analysis and determined whether this programming would be profitable, as Wiedenfels revealed during the April 26, 2022 and August 4, 2022 earnings calls.

158.    **Second**, in AT&T's Form 10-K for the fiscal year ended December 31, 2021, filed with the SEC on February 11, 2022 and incorporated into the Offering Documents, AT&T disclosed (p. 61/200) that "[d]irect costs increased in 2021 and decreased in 2020.  **The increase in 2021 was driven by higher film and programming costs and increased costs for HBO Max.** Direct costs supporting DTC revenues were" $7.9 billion in 2021, versus $5.4 billion in 2020 and $3.8 billion in 2019.

159.    This statement was misleading because it omitted that "substantial investments" in "film and programming costs and increased costs for HBO Max" were made without having determined whether there was a sufficient return on investment to justify those increased programming costs.  Investors were left with the impression that WarnerMedia had been making

investments to further its goal of driving subscribers to HBO Max, but in fact those expenses were made without determining investment cases for the new programing.

**D.     The Offering Materials Were False Because They Did Not Disclose That WarnerMedia Had Shifted Its Film Strategy to Direct-to-Streaming**

160.    Typically, a movie producer releases full length feature films first in movie theaters and then, some period of time later (usually 75-90 days), distributes them more widely, including through on-demand services and streaming services.  WarnerMedia historically had operated using this model and derived significant revenues from releasing films in theaters.

161.    As part of the strategy to drive significant subscribers to the HBO Max streaming service, Kilar announced on December 3, 2020 that for 2021, WarnerMedia would release all seventeen of its feature length movies simultaneously on HBO Max and in movie theaters.  The purpose was to drive subscribers to the HBO Max platform.  This strategy was nicknamed "Project Popcorn."

162.    Project Popcorn was a radical change and was not well received in Hollywood.  Specifically, according to "It's Not TV," it "threatened to undermine the way major Hollywood studios had been releasing movies for decades" and "caused an immediate uproar."  Movie theater owners were already suffering from a drop off in attendance due to Covid, and this strategy would only serve to hurt them further.

163.    In addition, the move was controversial due to the effect it would have on WarnerMedia.  Typically, theatrical releases are far more profitable for production studios than small-screen releases.  The theatrical release generates buzz and interest which can increase demand when the movie is released through secondary distribution methods like video-on-demand and streaming services.

49

164.     During AT&T's January 27, 2021 earnings call to discuss results for the quarter ended December 31, 2020, Stankey explained that the reduction in theatrical releases and the simultaneous release of films on HBO Max and in theaters (a decision that effectively eliminated the traditional theatrical window) was an effort "to make the best of a very challenging situation for all involved," referring to Covid restrictions.  MKM Partners analyst Eric Handler was quoted in a November 8, 2020 article published by the *Hollywood Reporter* stating that "Hollywood's biggest issue is that PVOD [Premium Video On Demand] has not come close to compensating for the lost box office revenue.  That's why we keep seeing these big movies pushed forward.  Some of the smaller films get tested on PVOD, but the longer this (pandemic) goes on, the more of a crunch there will be.  We haven't seen the end of PVOD testing, but I think when you spend $200M on a film, you have to think of the box office."

165.     In 2021, as Covid restrictions began to lift and moviegoers felt more comfortable returning to movie theaters, WarnerMedia expressed optimism that its movie business would experience a resurgence as it could engage in more theatrical releases.  For example, in its Form 10-K for the fiscal year ended December 31, 2021 (p. 61/200), AT&T attributed an increase in 2021 content revenues, in part, to "higher theatrical, with 2020 including only five worldwide theatrical releases compared to 17 in 2021.  The decrease in 2020 was primarily due to pandemic-related movie theater closures and television and theatrical production delays."

166.     Publicly, WarnerMedia stated it would not continue the Project Popcorn program in 2022.  For example, during her remarks at the Bloomberg Technology Summit on December 15, 2021, Ann Sarnoff (the CEO of Warner film and television studios) confirmed that the practice of releasing films in theaters and on HBO Max simultaneously would cease as of January 1, 2022.  However, what WarnerMedia did not disclose was that even though the Covid restrictions had

lifted, it still maintained the shift away from theatrical releases in favor of direct-to-streaming releases.  Thus, Project Popcorn continued into 2022.

167.     The Offering Documents discussed WarnerMedia's film release strategy in several places.  Those statements were materially misleading.

168.     During the August 4, 2022 earnings call, Zaslav discussed the direct-to-streaming business model for releasing movies to streaming apps rather than movie theaters.  Zaslav stated that the "expensive direct-to-streaming movies in terms of how people are consuming them on the platform, how often people go there or buy it or buy a service for it and how it gets nourished over time is no comparison to what happens when you launch a film in the motion – in the theaters.  **And so this idea of expensive films going direct-to-streaming, we cannot find an economic case for it.  We cannot find an economic value for it.**"

169.     Thus, WarnerMedia's strategy to bypass theatrical releases in favor of direct-to-streaming releases beyond what it had disclosed would occur for 2021 contributed to the downward revision of EBITDA figures.

170.     As a result of Discovery's failure to disclose that WarnerMedia had intended to continue its direct-to-streaming strategy into 2022, the following statements in the Registration Statement were false or misleading:

171.     **First**, the Registration Statement (p. 153/674) stated, "**WarnerMedia's content revenues consist primarily of licensing feature films for initial theatrical exhibition**, and licensing television programs for initial television broadcast or subscription video-on-demand (SVOD) streaming.  Additional film and television revenues are derived from distribution channels including international free-to-air, basic and premium pay television; television syndication; and further streaming services."  Similarly, Form 424(b) (p. 133/648) stated, "The WarnerMedia

Business's content revenues consist primarily of licensing feature films for initial theatrical exhibition, and licensing television programs for initial television broadcast or subscription video-on-demand streaming.   Additional film and television revenues are derived from distribution channels including international free-to-air, basic and premium pay television; television syndication; and further streaming services."

172.    These statements were misleading because they omitted that WarnerMedia had shifted away from its primary revenue stream for feature length films – licensing feature films for theatrical exhibition – to a direct-to-streaming model.   Further, it omitted that there was no "economic case" or "economic value" in the direct-to-streaming model.

173.    **Second**, the Registration Statement (p. 151/674) and Prospectus (p. 161/662) stated, "WarnerMedia produces and releases feature films for initial exhibition in theaters, on HBO Max **and, in 2021, simultaneously in theaters and HBO Max domestically**."   Similarly, Form 424(b) (p. 131/648) stated, "The WarnerMedia Business produces and releases feature films for initial exhibition in theaters, on HBO Max and, in 2021, simultaneously in theaters and HBO Max domestically."

174.    These statements were misleading because they omitted that WarnerMedia had extended its strategy of releasing films simultaneously in theaters and on HBO Max into 2022.

### E.    The Offering Documents Were False Because They Failed to Disclose That CNN+ Would Be Terminated

175.    On July 19, 2021, WarnerMedia announced that it would be launching the new CNN streaming service, CNN+.   Andrew Morse ("Morse"), CNN Executive Vice President, Chief Digital Officer and Head of CNN+ described it in a March 28, 2022 AZ Central article as "the most important launch for CNN since Ted Turner launched the network in June of 1980."

176.     CNN+ was positioned as the future of WarnerMedia's news programming.  Jason Kilar, hired to succeed Stankey as the CEO of WarnerMedia, was known as a "digital evangelist." According to a CNBC article titled, "What doomed CNN+?", published on April 24, 2022, a focal point of Kilar's mission was to develop CNN+ into a subscription news product that would house "video, podcasts, and all of CNN's interview and entertainment programming."   CNN hired McKinsey & Company, the consulting firm, to help develop the operations of CNN+.

177.     Jeff Zucker, the former leader of CNN, was "longtime friends with Zaslav," according to the CNBC article.  As Zaslav would be replacing Kilar as CEO of the new company, WBD, "Zucker seemed in line for a big role under Zaslav. . . . With a refreshed career outlook, Zucker began digging into CNN+."  Zucker planned to launch CNN+ in the first quarter of 2022, and "began hiring hundreds of people as producers, software engineers and marketing support." Indeed, "Zucker had the greenlight to spend hundreds of millions on the new service to give CNN a jumpstart into the digital era."

178.     Analysts believed that CNN+ would improve WarnerMedia's EBITDA for 2023. On January 26, 2022, JPMorgan reported that "[t]he company expects 2022 to be the year of peak content investment, and will also launch CNN+ and a number of European markets, so we cut EBITDA from a loss of $151 million to a loss of $598 million then slightly positive in 2023." Similarly, Cowen reported on January 26, 2022 that "EBITDA will also be affected by the planned launch of CNN+ this year."

179.     On March 3, 2022, CNN issued a press release in which it stated, "We're thrilled to offer CNN+'s world class journalism, premium storytelling and interview Club platform at this attractive price."  Morse further stated, "Nothing like CNN+ exists.  There is no news and non-

fiction streaming subscription offering available today, and only CNN can create and deliver a global news product with this kind of value to consumers."

180.    On March 15, 2022, *Forbes* Magazine published an article titled, "Everything You Need to Know About CNN Launch Date Price" and wrote, "Two weeks out from the launch of CNN+, the news network behind it isn't shy about the fact that it's going all-in with the talent stacked service that promises users an expansive roster of shows and deep library of content from day one.  In fact, in the words of one CNN official, the streamer launching on March 29 has gotten an investment that's 'orders of magnitude larger' than anything else CNN has taken on since the launch of the network."   Morse predicted that CNN+ would "become profitable within a few years."

181.    CNN+ was launched to great fanfare on March 29, 2022.  On that day, Kilar wrote a series of tweets explaining: "In my opinion, CNN+ is likely to be as important to the mission of CNN as the linear channel service has been these past 42 years.  It would be hard to overstate how important this moment is for CNN."   He added, "CNN+ is also important b/c it is CNN unmistakably embracing a scalable, robust paid digital business model."

182.    WarnerMedia invested at least $300 million in launching CNN+, and its budgets prepared before the Merger for the rest of 2022 and 2023 included an additional $1 billion investment.  On April 19, 2022, *Axios* reported that "[a]round $300 million has been spent and hundreds of jobs have been created to support" CNN+.  To develop content exclusively for CNN+, CNN "lured top talent from other networks," including "Kasie Hunt from NBC and Chris Wallace from Fox News," according to an article on cnn.com dated April 21, 2022 titled, "CNN+ will shut down at the end of April."

183.   CNN comprised a significant portion of the WarnerMedia business, accounting for $1 billion in profit in fiscal year 2021.

184.   Unbeknownst to investors, however, Zaslav had decided to shutter CNN+ even before the Merger had closed.  According to a CNBC article dated April 24, 2022, "[b]y early [2022], Zaslav had settled on a streaming strategy for Warner Bros. Discovery.  He wanted to push together HBO Max and Discovery+ and use news and live sports from WarnerMedia to make the streaming bundle even more attractive. . . . CNN will ultimately be a tab within the larger HBO Max-Discovery+ service."  This is despite the fact that Zaslav had publicly stated on December 8, 2021 that he had a vision for the combined company was to get "to the Holy Grail of 200 million-250 million global subscribers — with a suite of streaming services that include HBO Max, Discovery Plus and CNN Plus" (as reported by *Variety Magazine* on December 8, 2021 (titled "How David Zaslav Plans to Combine Discovery and WarnerMedia to Unleash 'Shock and Awe' on the Streaming Wars").

185.   The Merger closed on Friday, April 8, 2022.  The following Monday, April 11, 2022, WBD began the process of shuttering CNN+.  WBD abruptly eliminated all marketing and publicity for the essentially brand-new service, only two weeks after its launch.  Chris Licht, the new leader of CNN under the WBD umbrella, and Jean-Briac Perrette, CEO and President of Global Streaming and Games at WBD, told Morse and the CNN+ team that its "marketing budget was immediately going to zero."  The meeting lasted just one hour, according to the CNBC article dated April 24, 2022.  Ten days later, on April 21, 2022, CNN+ was officially canceled.

186.   Zaslav did not support CNN+ and if he had been able, he would have stopped WarnerMedia from launching it at all.  On April 21, 2022, *Variety* Magazine reported that the decision to cancel CNN+ less than two weeks after the close of the Merger

puts an abrupt end to an ambitious and aggressive venture that people familiar with the matter say rankled David Zaslav, the new CEO of Warner Bros. Discovery, from the start. Zaslav was annoyed by the decision of Jason Kilar, the former CEO of WarnerMedia when it was owned by AT&T, to launch CNN+ just weeks before Discovery was set to take over operations. But he was unable to communicate with WarnerMedia management, owning to legal boundaries surrounding the merger process.

187.   According to the CNBC article dated April 24, 2022, it was apparent to CNN staffers that the decision to cancel CNN+ had already been made before April 8, 2022. They wished that Discovery had "backchannel[ed] information" to convey unhappiness with the strategy, and said that "the reason Discovery chose not to relay information in the months leading up to CNN+'s launch" was so that Discovery would be able to point to its cost reductions in CNN+ as part of its synergy promises.

188.   According to the cnn.com article dated April 21, 2022, CNN's CEO Chris Licht told CNN staffers that "'this was an incredibly successful launch' but simply incompatible with the newly merged company's plans.'"

189.   Morse, who had been in charge of all of CNN's digital businesses and worked closely with Kilar, wrote a farewell note to employees stating, "[a]s the company enters an exciting and proud period of change, it's clear that the vision the new leadership has for the future is different than the one we've had," according to the April 21, 2022 cnn.com article. Despite this statement, "the sentiment" at CNN+ was one of "'total and utter shock.'"

190.   References to "news" in the Offering Documents are to CNN and CNN+. WarnerMedia did not broadcast or provide any news services except under the CNN brand. Therefore, investors reading the term "news" understood it to mean "CNN" and, given the publicity of its launch, also CNN+. This is confirmed by statements Zaslav made during the April 26, 2022 earnings call: "[L]et me start with news and CNN. The great – I love the news business,

we love the news business.  CNN is the leader in news.  They are the leader in global news, they are the best journalistic organization in the world, which they're showing."

191.    Prior to April 8, 2022, Zaslav and Wiedenfels had already determined that CNN+ would be shuttered once the Merger closed.  They did not disclose that decision to investors.

192.    The failure to disclose that Zaslav and Wiedenfels had determined to cancel CNN+ prior to the close of the Merger rendered the following statements in the Offering Documents false or misleading:

193.    **First,** the Registration Statement (pp. 41/674, 124/674, 207/674), Prospectus (pp. 38/674, 121/674, 204/674), and Form 424(b) (pp. 25/648, 93/648, 174/648), state: "The combination of Discovery's and the WarnerMedia Business's robust portfolios of entertainment, kids, **news** and sports content is expected to position WBD as a stronger **global competitor in streaming and digital entertainment** with favorable prospects in the global DTC race, and improve the overall growth profile for WBD in the future."

194.    This statement was misleading because, as of the date that the Registration Statement became effective, Zaslav and Wiedenfels had already determined that WBD would cancel CNN+, the streaming service to offer CNN.  Thus, the statement that "news" – *i.e.*, CNN – would position WBD to become a "global competitor in streaming and digital entertainment" was misleading.

195.    **Second**, the Registration Statement (p. 88/674), Prospectus (p. 85/662), and Form 424(b) (p. 71/648), stated:

> WBD's success will depend on its ability to consistently create and acquire content that meets the changing preferences of viewers in general, in special interest groups, in specific demographic categories and in various international marketplaces. **WBD will need to invest substantial amounts in the production or acquisition and marketing of its** entertainment, sports and **news before it learns whether such content will reach anticipated levels of popularity with consumers**.

WBD's success with such content will depend on audience acceptance and viewership. Failing to gain the level of audience acceptance Discovery expects for entertainment, sports and news content may negatively impact WBD's business, financial condition and results of operations.

196.    This statement was misleading because it did not disclose the following facts:

a.  WarnerMedia had **already** invested $350 million in CNN+;

b.  WarnerMedia had not performed an investment case for this expenditure; and

c.  Discovery and Zaslav determined prior to the close of the Merger that CNN+ would be canceled, and therefore he was not willing to "learn whether [the CNN+] content" would "reach anticipated levels of popularity with consumers." Rather than allow CNN+ the opportunity to gain "audience acceptance and viewership," Discovery and Zaslav had already determined to cancel CNN+.

197.    **Third**, the Registration statement (p. 90/674), Prospectus (p. 86/662) and Form 424(b) (p. 73/648), stated:

In January 2021, Discovery launched an aggregated DTC product, discovery+, in the United States. In May 2020, the WarnerMedia Business launched HBO Max in the United States. In connection with the Transactions, WBD expects to develop and implement a go-to-market strategy for its DTC products that coordinates and/or combines its offering of discovery+ and HBO Max. There can be no assurance that consumers and advertisers will embrace discovery+ and HBO Max or that subscribers will activate or renew a subscription.

198.    This statement was misleading because it omitted that Zaslav and Wiedenfels had already determined that CNN+ would be canceled upon consummation of the Merger. Investors had widely anticipated the launch of CNN+, and it would have been material information for them to know that, prior to the Merger's close, Zaslav had determined that CNN+ would be shuttered. Referring to plans about the streaming services Discovery+ and HBO Max without disclosing that

the streaming service CNN+ was going to be canceled once the Merger closed was materially misleading because investors were left with the impression that CNN+ would continue as planned.

### F.  The Offering Documents Were False Because They Failed to Disclose That Discovery's Due Diligence of WarnerMedia Was Flawed

199.    During the August 4, 2022 earnings call, Wiedenfels stated:

We're starting from a less favorable position compared to our expectations.  In addition to the clearly more challenging macroeconomic backdrop and a changing industry dynamic in the streaming space, **we have also now had an opportunity to fully assess legacy WarnerMedia's financials post-closing.** Having concluded this process, **we determined that certain legacy WarnerMedia budget projections that were made available to us prior to closing, varied from what we now view as legacy WarnerMedia's budget baseline post-closing.  On taking a deep dive in pressure testing, what we found, our assessment has resulted in lower EBITDA projections.**

200.    Wiedenfels continued, "[s]pecifically, we identified a number of approved investments and foregone revenue in various parts of the business that, when taken together, impacted full year 2022 EBITDA by roughly $2 billion."

201.    Wiedenfels later reiterated, in connection with explaining the adjusted 2022 and 2023 EBITDA guidance, "as noted earlier, the difference is in legacy WarnerMedia budget projections that were made available to us prior to closing versus what we now view as legacy WarnerMedia's budget baseline post-closing."

202.    In addition, Zaslav stated, "[s]trategically, we've looked hard at the [direct-to]-streaming business.  We've seen luckily **by having access now to all the data, how direct-to-streaming movies perform**.  And our conclusion is that expensive direct-to-streaming movies in terms of how people are consuming them on the platform, how often people go there or buy it or buy a service for it and how it gets nourished over time is no comparison to what happens when you launch a film in the motion – in the theaters.  And so this idea of expensive films going direct-to-streaming, we cannot find an economic case for it.  We can't find an economic value for it."

203.    These statements reveal that Discovery did not have all the information it needed during due diligence to conduct a proper review of the WarnerMedia business and to evaluate the value of the assets it was acquiring.   In particular, according to Zaslav's and Wiedenfels's statements during the August 4, 2022 earnings call, it was not until after the Merger closed that Discovery (i) had "an opportunity to fully assess legacy WarnerMedia's financials"; (ii) determined "legacy WarnerMedia's budget baseline" (and that this baseline differed from budget projections made available before the close of the Merger); (iii) identified "a number of approved investments and foregone revenue in various parts of the business" which significantly impacted EBITDA projections; and (iv) had "access . . . to all the data" to determine "how direct-to-streaming movies perform."

204.    These categories above are critical to valuing a media company and would be included in due diligence for a deal like the Merger.  This would have been vital information for Discovery to know to be able to accurately project revenue and cash flow for the studio/TV production side of the business, and accurately forecast EBITDA for HBO Max.

205.    The fact that Discovery's due diligence of the WarnerMedia assets was deficient is confirmed by other sources.  For example, months after the Merger closed, an AT&T spokesperson revealed in a *New York Times* article titled, "Was This the Worst $100 Billion Merger Ever?" and published on November 28, 2022, that AT&T "acknowledged that it hadn't disclosed [to Discovery during due diligence] spending at CNN+ or at the Warner studio, or its post-Dec. 31 [2021] margins at HBO, deeming that to be highly competitive information."

206.    The Registration Statement (p. 206/674) states that at the Discovery Board's May 16, 2021 meeting, in which the Board gave its final approval to the Transaction, "members of management of Discovery summarized . . . the results of Discovery's due diligence

review."  However, records of the May 16, 2021 Board meeting obtained in the *Monroe* Action show that during the meeting, management detailed "key" due diligence defects, including that: (1) due to "competitive issues," there was "limited availability" of WarnerMedia's "distribution and licensing agreements"; (2) AT&T did not make any WarnerMedia employees available to Discovery until the final days before the Merger was announced (and even then only made four employees available); and (3) AT&T's projections for WarnerMedia did not include approximately $200 million in costs associated with services that had been provided to WarnerMedia by AT&T (*e.g.*, tax and legal costs).  But these "key" gaps in Discovery's due diligence were not mentioned in the Registration Statement.

207.    Defendants did not disclose that Discovery's due diligence was deficient. This omission rendered the following four statements misleading:

208.    **First**, during Discovery's third quarter earnings call held on November 3, 2021, Credit Suisse analyst Doug Mitchelson asked: "Can you talk about the content vision for the combined company and how that's evolving? . . . [I]s Warner Bros investing enough in content under AT&T while they're focused on the merger, how are you thinking about how much content spend should be to win in global streaming versus how much the companies are spending today?" Wiedenfels assured investors that adequate due diligence had been done to determine whether these expenditures were justified.  He stated, "**We scrutinize sort of each other's investment plans as part of the deal discussions** and as we've said before all the financial guidance that we've given around the deal is always assuming a pretty significant step up in terms of content investments over the coming years."

209.    The statement that Discovery had "scrutinize[d] . . . investment plans as part of the deal discussions" is false for the following reasons:

a.  Wiedenfels told investors during WBD's April 26, 2022 earnings call, "I'm working very closely with our creative and financial leadership teams to examine the totality of our $23 billion plus of annual content spend to analyze the ROI of each dollar spent."   In other words, Wiedenfels and Discovery were only just looking at the $23 billion in annual content spend and analyzing the return on investment **after the Merger had closed.** Discovery had not, therefore "scrutinize[d] . . . investment plans as part of the deal discussions."

b.  Wiedenfels explained during the August 4, 2022 earnings call that "approved investments" impacted full year 2022 EBITDA, including "substantial investments in kids and animation content for both linear and D2C platforms without an adequate investment case against them," "substantial investments in direct to HBO Max films for which, again, we did not find sufficient support," and "significant incremental and loss-making content investments for the Turner networks."  He further reiterated that "the scripted content portfolio on the linear net, kids and animation, direct to HBO Max films as well as international local content" had not been "sufficiently supported by robust enough investment cases."   Therefore, Discovery had not "scrutinize[d]" the investment in new content "as part of the deal discussions."

c.  Also during the August 4, 2022 earnings call, Zaslav explained, "We've seen luckily **by having access now to all the data**, how direct-to-streaming movies perform.  And our conclusion is that expensive direct-to-streaming

movies in terms of how people are consuming them on the platform, how often people go there or buy it or buy a service for it and how it gets nourished over time is no comparison to what happens when you launch a film in the motion – in the theaters. **And so, this idea of films going direct-to-streaming, we cannot find an economic case for it**." Therefore, as Zaslav explained, the investment in new content was not "scrutinize[d] . . . as part of the deal discussions." In fact, Discovery did not have "access to all the data" and had not determined whether there was an "economic case" for the practice of producing films that would go straight-to-streaming.

210.    Wiedenfels's statement made during the November 3, 2021 analyst call constitutes a prospectus under Section 12(a)(2) of the Securities Act because it was transcribed and filed with the SEC as a written communication made in connection with and relating to the Merger pursuant to 17 C.F.R. § 230.425.

211.    **Second**, the Registration Statement (p. 226/674), Prospectus (p. 222/662), and Form 424(b) (p. 222/662) explicitly stated that:

> In connection with its due diligence review of the WarnerMedia Business, Discovery was provided with or considered certain non-public financial information relating to the WarnerMedia Business, **including certain internal financial forecasts, estimates and other financial and operating data relating to the WarnerMedia Business prepared by AT&T management for fiscal years 2019 through 2025** (the "WarnerMedia Projections").

212.    This statement was misleading because it failed to disclose that the information AT&T made available to Discovery was lacking significant data necessary for Discovery to be able to conduct a comprehensive and adequate review of WarnerMedia. In particular, the statement was false for the following reasons:

a. In the August 4, 2022 earnings call, Wiedenfels stated that "certain budget projections that were made available to us prior to closing varied form what we now view as legacy WarnerMedia budget baseline projections."  He reiterated in the same earnings call that "legacy WarnerMedia budget projections that were made available to us prior to closing" differed from "what we now view as legacy WarnerMedia's budget baseline post-closing."  Thus, it was misleading to tout in the Offering Documents Discovery's access to the "WarnerMedia Projections," as defined in the Registration Statement, because those varied from the actual "legacy WarnerMedia budget baseline projections."

b. In the August 4, 2022 earnings call, Zaslav stated, "We've seen luckily by having access now to all the data, how direct-to-streaming movies perform."  Thus, it was misleading to tout in the Offering Documents Discovery's access to "certain internal financial forecasts, estimates and other financial and operating data relating to the WarnerMedia Business prepared by AT&T management for fiscal years 2019 through 2025" because Discovery had not determined how direct-to-streaming movies performed until after the Merger closed, even though those movies had been released throughout 2021 and early 2022.

c. Discovery asked for specific information during the due diligence process that was not provided because it was deemed competitive information.  This includes: spending at CNN+ and at the Warner studio as well as HBO's post-December 31, 2021 margins.   Defendants did not disclose that

Discovery had explicitly asked for information that it deemed essential to conduct its due diligence of WarnerMedia, and was denied access to that information.

d.  Management informed the Discovery Board of Directors on May 16, 2021 about "key" due diligence defects, including that: (1) due to "competitive issues," there was "limited availability" of WarnerMedia's "distribution and licensing agreements"; (2) AT&T did not make any WarnerMedia employees available to Discovery until the final days before the Merger was announced; and (3) AT&T's projections for WarnerMedia did not include approximately $200 million in costs associated with AT&T-provided services.  Defendants did not disclose that they knew that this critical information was missing.

213.    **Third**, the Registration Statement (p. 192/674), Prospectus (p. 192/674), and Form 424(b) (p. 159/648) stated:

> On April 9, 2021, each of Discovery and AT&T provided the other party with **access to virtual data rooms to facilitate the parties' respective due diligence** work streams . . . **Mr. Zaslav and other members of management of Discovery reviewed long-range plan forecasts for Discovery prepared by Discovery management, as well as long-range forecasts for the WarnerMedia Business based on information provided by AT&T**.

214.    This statement was misleading because it failed to disclose that the information AT&T made available to Discovery was lacking significant data necessary for Discovery to be able to conduct a comprehensive and adequate review of WarnerMedia.  In particular, the disclosures made during the August 4, 2022 earnings call and other information listed in paragraphs 212(a)-(d) above, render this statement misleading, for the same reasons indicated above.

215.    In addition, Discovery asked for specific information during the due diligence process that was not provided because it was deemed competitive information.  This includes: spending at CNN+ and at the Warner studio, as well as HBO's post-December 31, 2021 margins. Defendants did not disclose that Discovery had explicitly asked for information that it deemed essential to conduct its due diligence of WarnerMedia, and was denied access to that information.

216.    **Fourth**, the Registration Statement (pp. 192-193/674, 195-196/674), Prospectus (pp. 189-190/662, 192-193/662), and Form 424(b) (pp. 159-160/648, 163/648) made the following misleading representations about Discovery's due diligence:

> Between April 10, 2021 and April 18, 2021, representatives of Discovery and AT&T, and their respective financial advisors, continued discussions regarding the proposed transaction.  During this period, AT&T reviewed with Discovery and its representatives, certain prospective financial information with respect to the WarnerMedia Business, including the WarnerMedia Projections.
>
> . . .
>
> On April 23, 2021 . . . Mr. Zaslav and other members of management of Discovery reviewed long-range plan forecasts for Discovery prepared by Discovery management, as well as long-range forecasts for the WarnerMedia Business based on information provided by AT&T.
>
> . . .
>
> On May 3, 2021, members of management of Discovery and AT&T, with their respective advisors in attendance, had calls to discuss . . . (iii) financial due diligence.
>
> . . .
>
> [O]n May 5, 2021, members of management of Discovery and AT&T, together with representatives from Allen & Company, LionTree and Goldman, had a call during which they reviewed the materials to be shared with the rating agencies, including Discovery's "Management Case" financial forecasts.

217.    These statements were misleading because they failed to disclose that the information AT&T made available to Discovery was lacking significant data necessary for Discovery to be able to conduct a comprehensive and adequate review of WarnerMedia.  In

particular, the disclosures made during the August 4, 2022 earnings call and other facts listed in paragraphs 212 (a)-(d) above, render this statement misleading, for the same reasons indicated above.

218.    In addition, Discovery asked for specific information during the due diligence process that was not provided because it was deemed competitive information.  This includes: spending at CNN+ and at the Warner studio, as well as HBO's post-December 31, 2021 margins. Defendants did not disclose that Discovery had explicitly asked for information that it deemed essential to conduct its due diligence of WarnerMedia, and was denied access to that information.

219.    These significant deficiencies in Discovery's due diligence of WarnerMedia were material because they would have raised serious questions about the accuracy of Discovery's valuation of WarnerMedia.  Discovery's substantial downgrading of financial projections only three months following the closing of the Merger demonstrates why the withheld information was critical to valuing WarnerMedia.  As a Barclays analyst stated on August 4, 2022, "the company [*i.e.*, Discovery] appears to have misjudged the base earnings of the acquired asset [*i.e.*, WarnerMedia] significantly (**which is pretty surprising for a deal of this scale to say the least**)."

X.    **REVELATION OF THE TRUTH AND LOSS CAUSATION**

220.    Defendants' misrepresentations, as alleged herein, caused economic loss to Lead Plaintiffs and the Class.  Between April 11, 2022 and August 4, 2022, both dates inclusive (the "Class Period"), WBD's stock price was artificially inflated as a result of Defendants' materially false and misleading statements and omissions in the Offering Documents.

221.    On April 21, 2022, news services began reporting that WBD management was shutting down CNN+, only one month after its launch.

222.    In response to these revelations, WBD's shares fell 6.8%, from a close of $23.01 per share on April 20, 2022, to a close of $21.45 per share on April 21, 2022.

223.    On April 26, 2022, before the stock markets opened for trading, WBD held its first quarter 2022 earnings conference call with securities analysts.  This was WBD's first public presentation as a new company.  Both Zaslav and Wiedenfels spoke during the call, and expressed disappointment in the first quarter results for WarnerMedia that AT&T had reported, particularly regarding operating profit and free cash flow.  Zaslav stated that WarnerMedia's "Q1 operating profit and cash flow for WarnerMedia were clearly below my expectations.  And given that Q1 performance and previously unplanned projects in sight, I currently estimate the WarnerMedia part of our profit baseline for 2022 will be around **$500 million lower than what I had anticipated**."

224.    When asked by a Bank of America analyst where the $500 million dollars in losses for the year had come from, Wiedenfels replied that the outlook was based on the first quarter results that had been publicly disclosed in "internal management reporting."  He stated, "take that aggregate operating profit number and that's essentially **$500 million lower than what I'm seeing today for the full year than what we put in our management case that was disclosed in the S4**."  In other words, Wiedenfels said that the 2022 EBITDA projections in the Registration Statement, Prospectus and other Offering Documents that had been provided to Discovery and Spinco stockholders three weeks earlier were overstated by $500 million.

225.    Also during the April 26, 2022 earnings call, Wiedenfels disclosed for the first time that WarnerMedia's new projects in development were of poor quality.  He stated that WBD was in the process of rectifying, "certain [WarnerMedia] investment initiatives underway in plain sight that I don't think have attractive enough return profiles . . . . I feel very confident in our ability to rectify some of the drivers behind the business case deviations and some very quickly, with the CNN+ decision last week being Exhibit A."  Wiedenfels repeated that "**CNN+ is just one example**, and I don't want to go through sort of a list of specific examples, but **there's a lot of**

**chunky investments that are lacking what I would view as a solid analytical financial foundation** and meeting the ROI hurdles that I would like to see for major investments.  2022 very much looks a little messier than probably what I had hoped for."

226.    In response to an analyst's question regarding how AT&T's operating results for WarnerMedia had changed the long-term free cash flow trends for WBD, Wiedenfels responded that, "if I take a step back here and just look at, call it, the past 15 months for WarnerMedia sort of as a carve out-group, we're looking at more than $40 billion of revenue and **really virtually no free cash flow**."

227.    As a result of these revelations, WBD common stock fell 7.8%, from $21.50 per share, where the stock closed on April 25, 2022, to a closing price of $19.83 per share on April 26, 2022.

228.    On August 4, 2022, after the stock markets closed, WBD held its second quarter earnings call with securities analysts.  Zaslav and Wiedenfels spoke during this call.  WBD management announced further revised guidance for the new combined company for fiscal year 2022 and 2023 that was dramatically lower than the prior guidance in which Zaslav and Wiedenfels had expressed confidence throughout the merger process.  It also was dramatically lower than the revised guidance ($500 million reduction) that Zaslav and Wiedenfels gave analysts during the first quarter earnings call on April 26, 2022.

229.    During the August 4, 2022 earnings call, Wiedenfels and Zaslav disclosed that WarnerMedia's "position" was different from what they had thought. "Certain legacy WarnerMedia budget projections" that had been used to calculate projections in the Offering Documents were false and rendered the resulting figures unreliable.  Ultimately, WBD revised downward its EBITDA projections by $2 billion.

230.    Specifically, WBD management announced that after fully assessing the financial statements of the WarnerMedia business it had just spent $43 billion acquiring, it now "**determined that certain legacy WM budget projections, that were made available to us prior to closing, varied from what we now view as legacy WM's budget baseline post-closing** . . . our assessment has resulted in lower EBITDA projections."  Zaslav further stated that there had been, "a number of approved investments and foregone revenue in various parts of the business that, when taken together, **impacted full year 2022 EBITDA by roughly $2 billion**."

231.    To summarize, WBD made the following revisions to its projections:

- Fiscal Year 2022 EBITDA – Revised down from $12 billion to $9.0-$9.5 billion;

- Fiscal Year 2022 Free Cash Flow – Revised down from $6 billion to $4 billion;

- Fiscal Year 2022 Free Cash Flow Conversion Rate – Revised down from 60% to 33-50%;

- Fiscal Year 2023 EBITDA – Revised down from $14 billion to $12 billion; and

- Fiscal Year 2023 Free Cash Flow – Revised down from $8 billion to $6 billion.

232.    During the August 4, 2022 earnings call, Zaslav and Wiedenfels specified the six reasons for these sharp and dramatic reductions to WBD's EBITDA and free cash flow guidance:

- "[N]umber one, significant reductions in external content sales.  As part of a corporate initiative to prioritize HBO Max growth globally, new content licensing deals to third parties were largely halted and content was, in general, made exclusive to HBO Max."

- "Number two, similarly, certain actions taken to limit HBO Max B2B distribution provided a headwind to performance."

- "Number three, substantial investments in kids and animation content for both linear and D2C platforms **without an adequate investment case against them**."

- "Number four, substantial investments in direct to HBO Max films for which, again, we did not find sufficient support."

- "Number five, significant incremental and loss-making content investments for the Turner networks. Specifically, content spend on shows and films that did not have a path to generate sufficient ratings or incremental monetization potential."

- "Number six, incremental corporate expenses transferred from AT&T resulting from the spin-off of WarnerMedia as per the final carve-out financials."

233.    During the August 4, 2022 earnings call (as described in paragraphs 124-125, above), WBD management also disclosed that they would change the way that WBD would calculate and report subscriber numbers.  This resulted in the exclusion of approximately 10 million HBO Max and Discovery subscribers from the amounts of subscribers previously represented in the Offering Documents.  This amounted to an 11% reduction in the universe of 95.8 million WBD subscribers that had been reported as of the close of the Merger.

234.    Zaslav and Wiedenfels also stated that WBD would revise the subscriber growth guidance that they had communicated to investors at the outset of the merger process (*see* May 17, 2021 Joint Press Conference Tr.; September 21, 2021 Goldman Sachs Global Media Conference Tr.) down from 200 million subscribers by 2025 to 130 million subscribers by 2025.  This decrease was especially disappointing, as it meant that WBD would no longer be able to compete with Disney+ and Netflix.

235.    The disclosures during the August 4, 2022 earnings call were surprising and disappointing to the market and constituted new material information about WBD.  In response, WBD's stock price fell 16.5%, from $17.48 where it had closed on August 4, 2022 to close at $14.59 per share, on August 5, 2022.

236.    During the ninety days following the end of the Class Period, WBD's stock price averaged $12.79939, and at the end of the ninety-day period the value of WBD's shares remained at $12.68.

## XI.    CLASS ACTION ALLEGATIONS

237.    Lead Plaintiffs bring this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, the common stock of WBD during the Class Period, specifically: persons or entities who (i) acquired shares of WBD common stock in exchange for shares of Discovery common stock; (ii) acquired shares of WBD common stock in exchange for shares of Spinco common stock; or (iii) bought shares of WBD during the period between April 11, 2022 and August 4, 2022, both dates inclusive (the "Class").

238.    Excluded from the Class are: (i) Defendants; (ii) any present or former executive officers of WBD, Discovery or AT&T; (iii) any person who was a member of the Board of Directors of  WBD, Discovery or AT&T at any time from January 1, 2021 through the present; (iv) any entity (including trusts) in which John C. Malone or any member of his family (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)) has any interest; (v) the legal representatives, heirs, successors, or assigns of any person specified in subparagraphs (i)-(iv), above; (vi) any entity  in which Defendants have or had a controlling interest; and (vii) any affiliate or subsidiary of WBD, Discovery, AT&T or Advance/Newhouse.

239.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's common stock was actively traded on a national securities exchange, the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of members in the Class.  Over 2.4 billion shares of WBD were issued pursuant to the Registration Statement and Amendment No. 2, and millions of WBD shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by WBD or its transfer

agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

240.     Lead Plaintiffs' claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws. Further, Lead Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation.

241.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the members of the Class are:

(a)     whether Defendants violated the Securities Act;

(b)     whether statements contained in the Registration Statement, Prospectus and other Offering Documents were false and/or omitted or misrepresented material facts;

(c)     whether the price of WBD common stock was artificially inflated; and

(d)     the extent of damage sustained by Class members and the appropriate measure of damages.

242.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.     THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

243.     The statutory safe harbor in the Securities Act pertaining to forward-looking statements under certain circumstances does not apply to any of the statements alleged herein to

be false and misleading because none of those statements were forward-looking within the meaning of 15 U.S.C. §§ 77z-2(i) and 78u-5(i) or any applicable jurisprudence.

## XIII.   CLAIMS FOR RELIEF

<u>COUNT I</u>
**Violations of Section 11 of the Securities Act Against Discovery, WBD, Zaslav, Wiedenfels, Steven Miron, Robert Miron, and Newhouse**

244.   Lead Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count.

245.   This claim is brought pursuant to Section 11 of the Securities Act against Discovery, WBD, Zaslav, Wiedenfels, Steven Miron, Robert Miron and Newhouse.

246.   The Registration Statement and Amendment No. 2 each contained untrue statements of material fact and omitted to state material facts necessary to make statements made in those registration statements (and the documents that they incorporated by reference) not misleading, as specified in paragraphs 109-219, above.   These statements were false and misleading on April 8, 2022, the date the registration statements became effective.

247.   As the issuer of the Registration Statement and Amendment No. 2, Discovery and its successor WBD are absolutely liable for the false and misleading statements contained therein.

248.   Defendants Zaslav, Steven Miron, and Robert Miron are liable because they each signed the Registration Statement and Amendment No. 2 and because each was a Director of the issuer at the time of the filing of the Registration Statement and Amendment No. 2.

249.   Defendant Wiedenfels is liable because he signed the Registration Statement and Amendment No. 2.

250.   Defendants Steven Miron and Newhouse are liable because they were named in the Registration Statement and Amendment No. 2 with their consent as persons about to become Directors of WBD.

251.    Defendants Zaslav, Wiedenfels, Steven Miron, Robert Miron and Newhouse acted negligently in that none of them conducted a reasonable investigation to ensure, or had reasonable grounds to believe at the time the relevant parts became effective, that the statements contained in (or incorporated by reference in) the Registration Statement and Amendment No. 2 were true and that there were no omissions of material fact required to be stated therein or necessary to make the statements therein not misleading.

252.    When Lead Plaintiffs and other members of the Class acquired WBD common stock in, pursuant to, and/or traceable to the Registration Statement and Amendment No. 2, they did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained therein.

253.    On September 23, 2022, the date on which the original suit asserting these claims was brought, the value of WBD common stock was $11.34 per share.  The price paid for WBD shares by Class members who acquired WBD shares in exchange for Discovery common stock and in exchange for Spinco common stock on April 8, 2022 was $24.47 per share.  The prices at which Class members who acquired WBD common stock in the market from April 11, 2022 through August 4, 2022 exceeded $11.34 per share.  Accordingly,  Class members have suffered damages.

**COUNT II**
**Violations of Section 12(a)(2) of the Securities Act**
**Against Discovery and WBD**

254.    Lead Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count.

255.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act against Discovery and WBD.

256.    Discovery and WBD offered, sold and solicited the purchase of WBD common stock in exchange for Discovery common stock and for Spinco common stock by means of a prospectus or oral communication, as specified in paragraphs 1-3, 73 and 144, above.

257.    The "prospectus" includes the Prospectus, issued on February 10, 2022 and Form 424(b), issued on March 28, 2022, as well as oral statements made during WBD's and Discovery's earnings calls on November 3, 2021 and February 24, 2022, as specified in paragraphs 73, 142-144 and 208-210, above.   The earnings calls constitute prospectuses for purposes of Section 12(a)(2) of the Securities Act because they were transcribed and filed with the SEC as written communications made in connection with and relating to the Merger pursuant to 17 C.F.R. § 230.425.

258.    The prospectuses included (and/or incorporated by reference) untrue statements of material fact and/or omitted to state (and/or incorporated by reference documents that omitted to state) material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

259.    Discovery and WBD were negligent in that they did not exercise reasonable care to ensure that the prospectuses did not include, or incorporate by reference, untrue or misleading statements or omissions of material fact.

260.    When they acquired WBD common stock in the Transaction in exchange for shares of Discovery common stock and in exchange for shares of Spinco common stock, Lead Plaintiffs and other members of the Class did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the prospectuses.

261.    Lead Plaintiffs and other members of the Class suffered damages in connection with their acquisition of WBD common stock in, pursuant to, and/or traceable to the Offering Documents.

262.    By reason of the foregoing, Discovery and WBD are liable to Lead Plaintiffs and other members of the Class for either (i) the consideration paid for the shares of WBD common stock they acquired, with interest thereon, less the amount of any income received thereon, upon tender of such securities; or (ii) damages as to the WBD common stock no longer owned.

**COUNT III**
**For Violations of Section 15 of the Securities Act**
**Against Zaslav and Wiedenfels**

263.    Lead Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count.

264.    This claim is brought pursuant to Section 15 of the Securities Act against Zaslav and Wiedenfels.

265.    As set forth above, Discovery and WBD are liable for the materially false and misleading statements and omissions contained in the Offering Documents pursuant to Sections 11 and 12(a)(2) of the Securities Act.

266.    In connection with the Transaction, and at the time all of the Offering Documents were prepared and filed, Zaslav controlled Discovery and WBD by virtue of his position as President and CEO of both companies, and as a Director of Discovery's Board of Directors. Defendant Zaslav also signed the Registration Statement and Amendment No. 2.

267.    In connection with the Transaction, and at the time that all of the Offering Documents were prepared and filed, Defendant Wiedenfels controlled WBD and its predecessor Discovery by virtue of his position as CFO of both companies.  Defendant Wiedenfels also signed the Registration Statement and Amendment No. 2.

268.     By virtue of their positions at Discovery, Zaslav and Wiedenfels had the power to, and did control the contents of, language, and statements made in the Registration Statement, Prospectus, Form 424(b), and Amendment No. 2.

269.     Zaslav and Wiedenfels had the power to, and did, control the decision-making of Discovery and WBD, including the content and issuance of the statements contained (and/or incorporated by reference) in the Offering Documents.  Zaslav and Wiedenfels were provided with, or had unlimited access to, copies of the Offering Documents (and/or the documents incorporated by reference therein) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued.  They had the power to prevent the issuance of the statements or omissions or to cause them to be corrected.  Zaslav and Wiedenfels each signed the Registration Statement or authorized the signature of the Registration Statement on their behalf (and/or certain of the Company's SEC filings incorporated by reference therein) and were directly involved in or responsible for providing false or misleading information contained in the Offering Documents (and/or documents incorporated by reference therein) and/or certifying and approving that information.

270.     Zaslav and Wiedenfels cannot demonstrate that they had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which Discovery and WBD are liable for their violations of Section 11 and 12(a)(2).

271.     Because of their control over Discovery and WBD, Zaslav and Wiedenfels are liable to Lead Plaintiffs and members of the Class jointly and severally with, and to the same extent as, Discovery and WBD.

## COUNT IV
### For Violations of Section 15 of the Securities Act
### Against Advance/Newhouse, Steven Miron, Robert Miron, and Newhouse

272.     Lead Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count.

273.     This claim is brought pursuant to Section 15 of the Securities Act against Advance/Newhouse, Steven Miron, Robert Miron and Newhouse.  Plaintiffs and other members of the Class purchased or otherwise acquired WBD common stock in, pursuant to, and/or traceable to the Offering Documents and were damaged thereby.

274.     As set forth above, Steven Miron, Robert Miron, and Newhouse are liable for the materially false and misleading statements and omissions contained in the Offering Documents pursuant to Sections 11 and 12(a)(2) of the Securities Act.

275.     Throughout the Class Period, and at the time that all of the Offering Documents were prepared and filed, Advance/Newhouse controlled WBD and its predecessor Discovery by virtue of their control over approximately 23% of Discovery's aggregate voting power and their ability to singularly prevent the consummation of the Merger.

276.     Indeed, as discussed above, Advance/Newhouse used their controlling power to hold the Merger hostage in order to extract a higher payout from the Merger than other Discovery shareholders received.  Thus, Advance/Newhouse were controlling persons within the meaning of the Securities Act.

277.     Advance/Newhouse, by virtue of their position of control and authority and their direct participation in and/or awareness of WBD's operations and finances, including their direct participation in the negotiations for the Merger, possessed the power to, and did, direct or cause the direction of the management and policies of WBD and its employees, or cause WBD to issue, offer, and/or sell securities pursuant to the defective Offering Documents.

278.    Advance/Newhouse had the power to, and did, control the decision-making of Discovery and WBD, including the content and issuance of the statements contained (and/or incorporated by reference) in the Offering Documents.  Advance/Newhouse were provided with or had unlimited access to copies of the Offering Documents (and/or the documents incorporated by reference therein) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued.  They had the power to prevent the issuance of the statements or omissions or to cause them to be corrected.  Advance/Newhouse's representatives Steven Miron and Robert Miron each signed the Registration Statement and Amendment No. 2 or authorized the signature of the Registration Statement and Amendment No. 2 on their behalf (and/or certain of the Company's SEC filings incorporated by reference therein) and were directly involved in or responsible for providing false or misleading information contained in the Offering Documents (and/or documents incorporated by reference therein) and/or certifying and approving that information.  Advance/Newhouse's representative Newhouse was an observer on Discovery's Board of Directors and was directly involved and participated in Board meetings where issues and terms related to the Transaction were discussed and negotiated.

279.    Advance/Newhouse, Steven Miron, Robert Miron, and Newhouse cannot demonstrate that they had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which Discovery and WBD are liable for their violations of Section 11 and 12(a)(2).

280.    Because of their control over Discovery and WBD, Advance/Newhouse, and Steven Miron, Robert Miron, and Newhouse as Advance/Newhouse's representatives, are liable to Lead Plaintiffs and members of the Class jointly and severally with, and to the same extent as, Discovery and WBD.

## XIV.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and (i) appointing Lead Plaintiffs as representatives of the proposed Class; and (ii) appointing their undersigned counsel as Class Counsel for the Class;

B.      Awarding compensatory damages in favor of Lead Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## XV.   JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: New York, New York
February 15, 2023

Respectfully submitted,

*/s/ Daniel L. Berger*
Daniel L. Berger
Caitlin M. Moyna
Lauren J. Salamon
Cecilia E. Stein
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: dberger@gelaw.com
Email: cmoyna@gelaw.com
Email: lsalamon@gelaw.com
Email: cstein@gelaw.com

*Counsel for Ohio Public Employees*
*Retirement System and State Teachers*
*Retirement System of Ohio*

**OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF OHIO**

Shawn Busken
30 East Broad Street
Columbus, OH 43215
Tel:  (800) 282-0515
Email:
Shawn.Busken@OhioAttorneyGeneral.gov

*Additional Counsel for Ohio Public Employees Retirement System and State Teachers Retirement System of Ohio*

82