USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__02/05/2024__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

OHIO PUBLIC EMPLOYEES RETIREMENT : 
SYSTEM and THE STATE TEACHERS :
RETIREMENT SYSTEM OF OHIO, Individually :
and on Behalf of All Others Similarly Situated, :
                     :
                 Plaintiffs, :
                     :
        -against- :
                     :
DISCOVERY, INC., WARNER BROS. :
DISCOVERY, INC., DAVID ZASLAV, :
GUNNAR WIEDENFELS, :
ADVANCE/NEWHOUSE PARTNERSHIP, :
ADVANCE/NEWHOUSE PROGRAMMING :
PARTNERSHIP, STEVEN A. MIRON, ROBERT :
J. MIRON, and STEVEN O. NEWHOUSE, :
                     :
                 Defendants. :

-------------------------------------------------------------X

                     22-CV-8171 (VEC)

                     <u>OPINION & ORDER</u>

VALERIE CAPRONI, United States District Judge:

        Plaintiffs in this putative securities class action allege that there were false and

misleading statements in the offering materials that preceded the merger transaction (the

"Merger" or the "Transaction") from which Warner Bros. Discovery, Inc. ("WBD" or the

"Merged Company") emerged.  Plaintiffs brought claims under Sections 11, 12(a)(2), and 15 of

the Securities Act of 1933 (the "Securities Act").  *See generally* Am. Compl., Dkt. 70.[1]  On April

7, 2023, Defendants moved to dismiss for failure to state a claim pursuant to Federal Rule of

---

[1]      On November 4, 2022, the Court consolidated this action with *Todorovski v. Discovery Inc.*, 22-CV-9125
(VEC) (S.D.N.Y.).  *See* Order, Dkt. 19.  On December 12, 2022, the Court appointed the Ohio Public Employees
Retirement System and the State Teachers Retirement System of Ohio as lead Plaintiffs for the putative class.  *See*
Order, Dkt. 65.  On February 15, 2023, Plaintiffs filed an amended, consolidated complaint.  *See* Am. Compl., Dkt.
70.

Civil Procedure 12(b)(6).[2]  *See* WBD Defs. Not. of Mot., Dkt. 86; Advance Defs. Not. of Mot., Dkt. 89.  For the following reasons, Defendants' motions are GRANTED, and the case is DISMISSED with prejudice.

## BACKGROUND[3]

In 2022, Discovery, Inc. ("Discovery") merged with WarnerMedia ("WarnerMedia"), the media business of AT&T Inc. ("AT&T'"), to form Defendant WBD, a publicly traded media and entertainment company that owns and operates brands including HBO, HBO Max, and CNN. Am. Compl. ¶¶ 18–19.

The Ohio Public Employees Retirement System and the State Teachers Retirement System of Ohio ("Plaintiffs") are public pension funds that acquired WBD common stock as a result of the Merger and subsequently in open market purchases between April 11, 2022, and August 4, 2022 (the "Class Period").  *Id.* ¶¶ 15–17, 220, 237.  According to Plaintiffs, Defendants' misrepresentations about the Merged Company artificially inflated WBD's share price, causing Plaintiffs' damages.  *Id.* ¶ 220.

### I.      Pre-Merger Business Strategy and Due Diligence

Before the Merger, WarnerMedia owned significant media assets, including the Metro-Goldwyn-Mayer film library, Warner Bros. Pictures, HBO, and CNN.  *Id.* ¶ 31.  Historically, a

---

[2]      Defendants also moved to dismiss claims against Discovery, Inc. for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  *See* WBD Defs. Not. of Mot., Dkt. 86.  Plaintiffs concede that Discovery, Inc. is not a proper Defendant in this case.  *See* Pls. Mem., Dkt. 91, at 1 n.1.

Although Defendants filed separate motions to dismiss, Defendants Advance/Newhouse Partnership, Advance/Newhouse Programming Partnership, Steven A. Miron, Robert J. Miron, and Steven O. Newhouse (the "Advance Defendants") incorporated the memorandum filed by Discovery, Inc., WBD, David Zaslav, and Gunnar Wiedenfels (the "WBD Defendants") by reference.  *See* Advance Defs. Mem., Dkt. 90, at 1.

[3]      For the purposes of this Opinion, the Court assumes the truth of the facts alleged in the Amended Complaint.  The Court also considers materials incorporated into the Amended Complaint by reference, documents that are integral to the Amended Complaint, and materials subject to judicial notice.  *See Colbert v. Rio Tinto PLC*, 824 F. App'x 5, 10 n.5 (2d Cir. 2020); *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 80 (2d Cir. 2018).

significant portion of WarnerMedia's revenues came from licensing its content to third parties. *Id.* ¶ 132.  WarnerMedia launched HBO Max, its own streaming service, in 2020.  *Id.* ¶¶ 40–41. In an effort to change the trajectory of HBO Max, which initially struggled to attract viewers, WarnerMedia spent billions of dollars on new content development and, in 2021, released its new films simultaneously on HBO Max and in theaters — a controversial move.  *Id.* ¶¶ 42–43, 161, 163.  Also in 2021, WarnerMedia announced that it would launch CNN+, a news streaming service.[4]  *Id.* ¶¶ 175–77.  Around the same time, Discovery launched its own streaming platform, Discovery+.  *Id.* ¶ 48.  Competition for users of streaming platforms was fierce.  *Id.* ¶¶ 38, 110.

In February 2021, Discovery and AT&T began to discuss the possible merger of Discovery and WarnerMedia.  *Id.* ¶¶ 53–54.  The companies entered a non-disclosure agreement and gave each other access to virtual data rooms to facilitate due diligence.  *Id.* ¶¶ 56–57.  The Merger ultimately closed on April 8, 2022, and WBD shares began trading on April 11, 2022. *Id.* ¶ 62.

## II.    Defendants' Alleged Misstatements or Actionable Omissions

In connection with the Merger, Defendants filed with the U.S. Securities and Exchange Commission (the "SEC"): a registration statement (the "Registration Statement"); an amendment to the Registration Statement; a prospectus (the "Prospectus"); a preliminary information statement (the "Information Statement"); and a form 424(b) (the "Form 424(b)") (together, the "Offering Documents").  *Id.* ¶¶ 69–77, 84.  All of the Offering Documents were filed between February 4, 2022, and April 8, 2022.  *Id.* ¶¶ 69–77.

Plaintiffs allege that the Offering Documents misrepresented: (1) the number of streaming subscribers the Merged Company would have based on the number of subscribers of

---

[4]    CNN+ was actually launched in March 2022.  Am. Compl. ¶ 181.

the merging companies; (2) WarnerMedia's content licensing strategy; (3) the extent to which

the likely profitability of WarnerMedia's investment in the development of content had been

analyzed; (4) the extent to which WarnerMedia had shifted to streaming films directly instead of

releasing them in theaters first; (5) the future of CNN+; and (6) Discovery's due diligence in

connection with the Merger.  *Id.* ¶¶ 5–10.

### A.  Streaming Subscriber Numbers

The Registration Statement and Prospectus stated that the total number of subscribers for

HBO, HBO Max, and Discovery as of September 30, 2021, was 89.4 million.  *Id.* ¶ 120a.  The

Form 424(b) reported that, as of December 31, 2021, those services had 95.8 million subscribers.

*Id.* ¶ 120b.

Although the Offering Documents stated that subscriber numbers for HBO Max included

"wholesale subscribers and subscribers receiving access through bundled services that may not

have signed in," and that Discovery "may refer to the aggregate number of subscriptions across

its [direct-to-consumer] services as subscribers," they did not specify the number of

"unactivated" subscribers of HBO and HBO Max or the number of "non-core" subscribers of

Discovery.  *Id.* ¶¶ 122–23; *see also* Registration Statement, Dkt. 88-1, at 108, 114; Prospectus,

Dkt. 88-2, at 108, 114; Form 424(b), Dkt. 88-3, at 85, 91.

According to Plaintiffs, subscriber numbers reported in the Offering Documents were

misleading because they included non-paying HBO and HBO Max subscribers who had not

activated their accounts, as well as "non-core"[5] Discovery subscribers, and did not specify how

many such "unactivated" and "non-core" subscribers existed.  Am. Compl. ¶¶ 121, 126.

---

[5]      Discovery's non-core programming included Eurosports Player, Motortrend, and Discovery Kids.  *Id.* ¶¶
124, 131.

### B.  Content Licensing Strategy

The Registration Statement, Prospectus, and Form 424(b) stated that WarnerMedia's content "is also licensed to third parties for use as part of their various video services and platforms." *Id.* ¶ 135.  The Offering Documents listed as a risk factor that "[f]ailure to renew, renewal with less favorable terms, or termination" of WarnerMedia's "content licenses and similar distribution agreements may cause a decline in WBD's revenue." *Id.* ¶ 139.  The Offering Documents further noted that "[c]hanges in distribution strategy" may also "drive changes in the licensee fees" which "may in turn negatively affect WBD's content revenue." *Id.*

Discovery stated during a February 24, 2022 earnings call[6] that WarnerMedia was selling its content, comprised of more than "100 active series . . . to over 20 platforms and outlets" and is "a content maker and content owner generating significant revenue, free cash flow and most importantly, optionality." *Id.* ¶ 142.

According to Plaintiffs, those statements were misleading because they failed to disclose that WarnerMedia had changed its business strategy of licensing content to third parties in favor of delivering its content exclusively to its HBO Max streaming service. *Id.* ¶¶ 136, 140, 143.

### C.  The Likely Profitability of Investments in Content Development

The Offering Documents disclosed that WarnerMedia had invested substantial sums to develop new content. *Id.* ¶¶ 156, 158.  According to Plaintiffs, those statements were misleading because they failed to disclose that WarnerMedia had not analyzed whether its investment in content development would likely be profitable. *Id.* ¶¶ 157, 159.

---

[6]     Plaintiffs assert that the earnings call statement constitutes a prospectus under the Securities Act because it was transcribed and filed with the SEC as a written communication made in connection with the Merger. *Id.* ¶ 144 (citing 17 C.F.R. § 230.425).  Defendants do not dispute that assertion.

### D.  Direct-to-Streaming Strategy

The Registration Statement and the Form 424(b) stated that WarnerMedia's content revenues "consist[ed] primarily" of licensing feature films for initial theatrical exhibition and licensing television programs for initial television broadcast. *Id.* ¶ 171.  According to Plaintiffs, those statements were misleading because they failed to disclose that WarnerMedia had "shifted away" from licensing feature films for theatrical distribution to a direct-to-streaming model, a strategy that purportedly lacked economic value. *Id.* ¶ 172.

The Registration Statement and the Prospectus stated that WarnerMedia produces and releases feature films "for initial exhibition in theaters, on HBO Max and, in 2021, simultaneously in theaters and HBO Max domestically." *Id.* ¶ 173.  According to Plaintiffs, those statements were misleading because they failed to disclose that WarnerMedia had extended into 2022 its strategy of releasing films simultaneously to theaters and to HBO Max.[7] *Id.* ¶ 174.

### E.  The Future of CNN+

The Registration Statement, Prospectus, and Form 424(b) stated that the combination of Discovery's and WarnerMedia's "robust portfolios of entertainment, kids, news and sports content" was "expected to position WBD as a stronger global competitor in streaming and digital entertainment . . . ." *Id.* ¶ 193.  According to Plaintiffs, those statements were misleading because, at some unspecified point prior to April 8, 2022, executives of Discovery had decided

---

[7]     Plaintiffs do not allege any facts in support of the assertion that WarnerMedia had extended into 2022 its strategy of simultaneous releases of movies to theaters and to HBOMax.  *Id.* ¶ 166.  Plaintiffs cite WBD's statements during its second quarter earnings call, *see id.* ¶¶ 166–68, but the transcript of the call does not reflect a representation from anyone that WBD was continuing to release films simultaneously on HBO Max and in theaters, *see* Aug. 2022 Earnings Call Tr., Dkt. 88-8.  Plaintiffs also cite a 2021 media report in which WarnerMedia announced that it *would cease* releasing films simultaneously on HBO Max and in theaters as of January 1, 2022.  Am. Compl. ¶ 166.

that WBD would cancel CNN+ after the Merger,[8] and CNN+ was to be the Merged Company's only news streaming platform.  *Id.* ¶¶ 190–91, 194.

The Registration Statement, Prospectus, and Form 424(b) also stated that WBD "[would] need to invest substantial amounts in the production or acquisition and marketing of its entertainment, sports and news before it [could] learn[] whether such content [would] reach anticipated levels of popularity with consumers."  *Id.* ¶ 195.  According to Plaintiffs, those statements were misleading because they failed to disclose that: WarnerMedia had already invested over $300 million in CNN+; WarnerMedia had "not performed an investment case" for that investment; and executives of Discovery had determined before the Merger closed that, if the deal closed, CNN+ would be canceled.  *Id.* ¶ 196.

## F.  Discovery's Due Diligence

During a November 3, 2021 earnings call,[9] Discovery stated that Discovery and WarnerMedia were "scrutiniz[ing] . . . each other's investment plans" as part of the Merger discussions.  *Id.* ¶ 208.  The Registration Statement, Prospectus, and Form 424(b) stated that, in connection with its due diligence review of WarnerMedia, Discovery had access to certain non-public financial information, including WarnerMedia's internal financial forecasts, estimates, and other financial operating data.  *Id.* ¶¶ 211, 216.  These same filings also stated that, as part of

---

[8]    In support of this assertion, Plaintiffs cite an April 14, 2022 CNBC article.  *See id.* ¶ 187; Apr. 2022 CNBC Article, Dkt. 88-18.  The CNBC article, however, states that staffers were "frustrat[ed]" that Discovery did not "backchannel information to delay the CNN+ launch if they were that unhappy with the [platform's] strategy" — not that Discovery knew before the Merger that it *would* cancel CNN+.  Apr. 2022 CNBC Article at 7.

Plaintiffs concede that the statements contained in paragraph 197 of the Amended Complaint were not misleading.  *See* Pls. Mem. at 25 n.12.

[9]    Plaintiffs assert that statements made during the call — which occurred before the Class Period began — constitute a prospectus under the Securities Act because the call was transcribed and filed with the SEC as a written communication made in connection with the Merger.  *Id.* ¶ 210 (citing 17 C.F.R. § 230.425).  Plaintiffs do not allege when the transcript was filed with the SEC.  Because Defendants do not contest the viability of this allegation based on timing, the Court need not address the issue.

the due diligence process, Discovery and WarnerMedia had given each other access to virtual data rooms, which included business forecasts.  *Id.* ¶ 213.

According to Plaintiffs, those statements were misleading because they failed to disclose that: Discovery had not scrutinized WarnerMedia's spending on content; Discovery had not been given comprehensive access to WarnerMedia's financial and streaming data; WarnerMedia had refused to disclose certain data because it was supposedly competitive information; and Discovery's due diligence process suffered from other defects including limited access to WarnerMedia's distribution and licensing agreements and to its employees.[10]  *Id.* ¶¶ 209, 212, 214–15, 217–18.

### III.     Post-Merger Disclosures and WBD's Revised Earnings

A few days after the Merger closed, WBD began shuttering CNN+; the platform was officially canceled by April 21, 2022.  *Id.* ¶¶ 185, 221.  Allegedly in response to this news, WBD's share price declined by 6.8%.  *Id.* ¶ 222.

WBD disclosed during its first quarter earnings call, which occurred shortly after the Merger closed, that WarnerMedia had invested in content, including CNN+, without — by WBD's standards — a "solid analytical, financial foundation" for those investments, and that WBD was closely examining the Merged Company's spending on content.  *Id.* ¶ 151, 209, 225. WBD also stated that WarnerMedia's first quarter operating profit and cash flow numbers were

---

[10]     In support of this assertion, Plaintiffs cite materials from Discovery's May 16, 2021 board meeting, which reflect that Discovery's management had identified due diligence limitations, including limited access to WarnerMedia's distribution and licensing agreements due to "[c]ompetitive issues." *Id.* ¶ 206; *see also* 2021 Board Materials, Dkt. 88-22, at 5.  The board meeting materials reflect that Discovery imposed the same limitations on its due diligence disclosures to WarnerMedia "for the same reasons."  2021 Board Materials at 5.

"clearly below [its] expectations."[11] *Id.* ¶¶ 223, 226.  Allegedly in response to these statements, WBD's share price declined by 7.8%.  *Id.* ¶ 227.

By its second quarter earnings call in 2022, WBD had determined that it should reduce its projected 2022 earnings before interest, taxes, depreciation and amortization ("EBITDA") by roughly $2 billion.  *Id.* ¶¶ 137, 152–53.  WBD attributed that decline to several things, including that: prior to the Merger, WarnerMedia had "largely halted" new content licensing deals to third parties, *id.* ¶¶ 137, 232; there were projects in development that lacked "a solid analytical financial foundation," *id*. ¶¶ 152–54, 209, 232; and a judgment had been made that certain of the budget projections made by legacy WarnerMedia prior to closing "varied from what [WBD management] now view as legacy WarnerMedia's budget baseline post-closing," *id*. ¶¶ 199–200, 229–30, 232.  Also on that earnings call, WBD announced that it would exclude 10 million subscribers comprised of non-core subscribers of legacy Discovery and "unactivated subscribers" of HBO and HBO Max from its subscriber tally going forward[12] and that it would revise its subscriber growth projections downward.  *Id.* ¶¶ 124, 233–34.  In addition, after gaining access to "all the data," WBD stated that it could not find "an economic case for" or "economic value [in]" simultaneously releasing films on streaming platforms and in theaters.  *Id.* ¶¶ 168–69, 202.  According to Plaintiffs, these statements caused a 16.5% decline in WBD's share price.  *Id.* ¶ 235.

---

[11]     According to the Amended Complaint, AT&T had reported disappointing results for WarnerMedia for the first quarter of 2022, particularly with respect to operating profit and free cash flow.  Am. Compl. ¶ 223.  Based on those results, as reported by AT&T, WBD estimated that "the WarnerMedia part of [WBD's] profit baseline for 2022" would be "around $500 million lower than . . . anticipated."  *Id*. ¶¶ 223–24.

[12]     WBD said that it made this adjustment to give investors "a clear and transparent number of true paying subscribers" to its "core service."  *Id.* ¶ 125.

**DISCUSSION**

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In general, "a complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted).  When considering a Rule 12(b)(6) motion to dismiss, the Court draws all reasonable inferences in the light most favorable to the plaintiff.  *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013) (citation omitted).  The Court is not required, however, to "accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

**I.     Plaintiffs Have Not Adequately Stated Claims Under Sections 11 or 12(a)(2) of the Securities Act**

Plaintiffs have not adequately alleged any actionable statements or omissions[13] under Sections 11 or 12(a)(2) of the Securities Act because (1) the Offering Documents accurately explained the methodology WarnerMedia and Discovery used for calculating the number of subscribers to their streaming platforms; (2) Defendants were not required to disclose that WarnerMedia had allegedly changed its business strategy with respect to third-party licensing deals because it did not hype a contrary strategy; (3) Plaintiffs did not adequately allege that

---

[13]     The parties do not appear to dispute that Plaintiffs primarily allege purported omissions, not misstatements. *See* WBD Defs. Mem., Dkt. 87, at 7; Pls. Mem. at 14, 17, 21, 24–25, 27–28 (faulting Defendants for "not disclosing" the number of inactive subscribers, "not disclos[ing]" that WarnerMedia had largely halted content licensing agreements, "failing to disclose" that WarnerMedia had not performed adequate return-on-investment analyses for its content development, the "omission" that WarnerMedia was pursuing direct-to-streaming despite its lack of profitability, "failure to disclose" that Discovery had decided to cancel CNN+, and failure to disclose that Discovery had not conducted robust due diligence before the Merger, and not contesting Defendants' assertion that the Amended Complaint only alleges omissions under the Securities Act).

WarnerMedia failed to analyze whether its investment in content likely would be profitable; (4) Plaintiffs did not adequately allege that WarnerMedia had shifted away from licensing feature films for theatrical distribution in favor of a direct-to-streaming model; (5) Defendants were not obligated to disclose information about CNN+ merely because the Offering Documents discussed the broader content strategies of the parties to the Merger; and (6) Defendants were not obligated to disclose limitations to the Merger's due diligence process because the Offering Documents did not represent that Discovery was given comprehensive access to WarnerMedia's non-public information.

### A.  Legal Standard

Section 11 of the Securities Act ("Section 11") prohibits "materially misleading statements or omissions in registration statements filed with the SEC."  *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (citing 15 U.S.C. § 77k(a)).  A plaintiff "need not allege scienter, reliance, or loss causation" to establish a prima facie Section 11 claim. *Id.* at 359.  A Section 11 claim need only satisfy the basic notice pleading requirements of Federal Rule of Civil Procedure 8(a)(2).  *Id.* at 358.[14]  The standard for claims under Section 12(a)(2) of the Exchange Action ("Section 12(a)(2)") is identical to the standard for a Section 11 claim, except that it applies to prospectuses and oral communications.  *Hutchison v. Deutsche Bank Secs. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011); *see also Steamfitters Local 449 Pension Plan v. AT&T Inc.*, No. 21-2698, 2022 WL 17587853, at *3 (2d Cir. Dec. 13, 2022) (summary order).

---

[14]     Although claims under Sections 11 and 12(a) of the Securities Act ordinarily need only to satisfy the basic notice pleading requirements of Federal Rule of Civil Procedure 8(a), "allegations that sound in fraud are subject to the heightened pleading standard of [Federal Rule of Civil Procedure] 9(b) even though scienter is not an element of the Securities Act claims."  *IAM Nat'l Pension Fund v. Farfetch Ltd.*, No. 21-2752, 2023 WL 2879304, at *1 (2d Cir. Apr. 11, 2023) (citing *Rombach v. Chang*, 355 F.3d 164, 171–72 (2d Cir. 2004) (summary order)).  The Court need not decide whether, as Defendants contend, a heightened pleading standard applies because, for the reasons discussed *infra*, Plaintiffs' claims do not meet the more lenient standard under Federal Rule of Civil Procedure 8(a).

Two types of omissions can give rise to liability under the Securities Act.  First, a defendant can be found liable for omitting information that is required to be disclosed under the securities laws.  *See In re Morgan Stanley Inf. Fund Secs. Litig.*, 592 F.3d at 360–61.  Second — as Plaintiffs primarily argue in this case — a defendant can be found liable for failing to disclose information that is necessary to keep the representations that it does make from being misleading.  *Id.* at 360–61, 365.  When a defendant makes a disclosure about a particular topic, "the representation must be 'complete and accurate,'" *id.* at 366 (quoting *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)), based on the information available to it at the time, *see In re JP Morgan Chase Secs. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (collecting cases).  A corporation is not required to disclose a fact, however, "merely because a reasonable investor would very much like to know that fact."  *In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).

To determine whether a misstatement or omission is material, the Court must consider whether "defendants' representations, taken together and in context, would have misled a reasonable investor."  *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (internal quotation marks and citation omitted).  In other words, an omission is considered material if, "in light of the information already disclosed to investors  . . . there is a *substantia*l likelihood that the disclosure of the [omitted material] would have been viewed by the *reasonable* investor as having *significantly* altered the total mix of information [already] made available."  *In re ProShares Trust Secs. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (citations omitted).

A plaintiff may not plead a Securities Act claim "with the benefit of 20/20 hindsight" or base the claim on a "backward-looking assessment" of the statement.  *Charter Twp. of Clinton*

*Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*, No. 08-CV-7062 (PAC), 2010 WL 4642554, at *11 (S.D.N.Y. Nov. 17, 2010) (internal quotation marks and citations omitted).

### B. Application

#### 1. Number of Streaming Subscribers

Plaintiffs allege that the Offering Documents were materially misleading because they provided the total number of subscribers for HBO, HBO Max, and Discovery without specifying how many of those subscribers were "unactivated" or subscribed to non-core services. *See* Am. Compl. ¶¶ 120–26.[15]

Failure to include in the Offering Documents the number of unactivated and non-core accounts is not an actionable omission because the Offering Documents were not misleading. Plaintiffs do not argue that the numbers reported were inaccurate and concede that the Offering Documents disclosed that the numbers reported included unactivated subscriptions. *See id.* ¶ 122; Pls. Mem., Dkt. 91, at 14.[16]  Plaintiffs maintain instead that the Offering Documents presented actionable "half-truths" because Defendants should have separately reported the

---

[15]    Defendants primarily argue that Plaintiffs have not adequately alleged a materially misleading omission because: (1) the Offering Documents disclosed that the reported subscriber numbers included unactivated and non-core subscriptions; (2) WBD disclosed on its first post-Merger earnings call that it was in the process of preparing "a more refined and detailed update" regarding subscriber numbers; and (3) Plaintiffs failed to allege how any omission was material, especially because the market anticipated that subscriber metrics would be adjusted after the Merger closed. *See* WBD Defs. Mem. at 9–12.

In response, Plaintiffs primarily argue that: (1) Defendants' disclosure of their methodologies for computing subscriber figures does not rehabilitate the "half-truths" in the Offering Documents; (2) WBD's decision to exclude unactivated and non-core subscribers from its disclosures post-Merger shows that the Offering Documents were misleading; (3) the Offering Documents said nothing about non-core Discovery+ subscribers; (4) Defendants' attempts to justify their omissions are inappropriate at the pleading stage; and (5) Plaintiffs adequately alleged materiality because WBD overstated the number of subscribers by 11% and investors were allegedly highly attuned to subscriber numbers. *See* Pls. Mem. at 13–17.

[16]    Plaintiffs argue that the Offering Documents did not disclose that the number of Discovery subscribers included subscribers to its non-core services. *See* Pls. Mem. at 15.  The Offering Documents, incorporated into the Amended Complaint by reference, reflect the contrary. *See* Registration Statement, Dkt. 88-1, at 108 (explaining that Discovery "may refer to the aggregate number of subscriptions across its [direct-to-consumer] services as subscribers"); Prospectus, Dkt. 88-2, at 108 (same); Form 424(b), Dkt. 88-3, at 85 (same).

number of unactivated subscribers and subscribers to non-core legacy Discovery services to provide a complete picture of their subscription data.  *See* Pls. Mem. at 14–15.

It is well settled, however, that a violation of federal securities law cannot generally "be premised upon a company's disclosure of accurate historical data."  *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38–39 (2d Cir. 2012) (concluding that a company's "literally true" statements about its earnings were not actionable under Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)") even though the defendant "did not acknowledge the long-term unsustainability of its business model" (citing *In re Int'l Bus. Machs. Corp. Secs. Litig.*, 163 F.3d 102, 108 (2d Cir. 1998)) (summary order).[17]  Nor is a defendant required to disclose a fact "simply because it may be relevant or of interest to a reasonable investor."  *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152–53 (2d Cir. 2013) (internal quotation marks and citation omitted).  The Offering Documents reported subscriber numbers of the to-be-merged companies that were accurate and were accompanied by the companies' methodologies; the methodologies clearly disclosed that WarnerMedia included unactivated accounts and that Discovery included subscribers to all of its direct-to-consumer services.  Plaintiffs have, therefore, failed adequately to allege an actionable omission.  *See In re Eros Int'l Secs. Litig.*, No. 15-CV-8956 (AJN), 2017 WL 6405846, at *6 (S.D.N.Y. Sept. 22, 2017) (concluding that

---

[17]     Plaintiffs repeatedly characterize caselaw involving claims under Section 10(b) as inapplicable.  *See* Pls. Mem. at 11, 15, 16 n.6.  Although claims under Section 10(b) are indeed subject to a heightened pleading standard with respect to fraud allegations and require allegations of scienter, Section 10(b) claims — just like Section 11 and Section 12(a)(2) claims — require plaintiffs to "plausibly allege a material misrepresentation or omission by the defendant[s]."  *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 836 (S.D.N.Y. 2019) (internal quotation marks and citation omitted); *see also Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*, No. 16-CV-3068 (AJN), 2017 WL 4082482, at *5 (S.D.N.Y. Aug. 24, 2017) ("The standard for determining whether a defendant made a material misstatement or omission is essentially the same under Section 10(b), Section 11, and Section 12." (citing *Rombach*, 355 F.3d at 172 n.7)), *aff'd*, 735 F. App'x 11 (2d Cir. 2018).  Caselaw regarding claims under Section 10(b) is, therefore, instructive on whether the complained-of statements constitute material misstatements or omissions.

plaintiffs failed adequately to allege an actionable omission under Section 10(b) even though defendants chose to report their user numbers without breaking out the number of users who could watch full-length films; the figures were "not plainly inaccurate" and the mere fact that defendants "*could have* defined and reported 'users' in an alternate way that took into account the specifics of their use" did not amount to misrepresentation), *aff'd*, 735 F. App'x 15 (2d Cir. 2018); *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 165, 179–80, 185 (E.D.N.Y. 2017) (concluding that plaintiffs failed adequately to allege an actionable omission under Section 12(a)(2) even though defendants reported performance metrics based on platform members and active sellers without accounting for counterfeiters; defendants "explained their methodology and supplied the plaintiffs with all the information they needed to assess the reported financial results"), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).[18]

For all of those reasons, Plaintiffs have not adequately alleged actionable omissions in the Offering Documents relating to the number of subscribers to the companies' subscription services.

---

[18] Plaintiffs insist that the Offering Documents were misleading because, after the Merger closed, WBD changed its reporting methodology to exclude unactivated subscribers and subscribers to non-core legacy Discovery services. *See* Pls. Mem. at 13–14; Am. Compl. ¶ 125; Aug. 2022 Earnings Call Tr. at 9. The mere fact that, after the Merger, WBD chose to report subscription figures using a different methodology does not render the Offering Documents misleading. *Cf. Wandel v. Gao*, 590 F. Supp. 3d 630, 645 (S.D.N.Y. 2022) (concluding that plaintiffs failed to allege actionable omission claims under Section 11 because "the mere fact that [the defendant] eventually revised" its financial reports "[did] not connote that that the [c]ompany's earlier statement about its earnings expectations was false or misleading when made" (quoting *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 40–41 (S.D.N.Y. 2016)). WBD's statement that it would provide "a clear and transparent number of true paying subscribers" going forward is not an admission that the Offering Documents were misleading.

Plaintiffs also contend that the market's reaction to WBD's newly reported subscriber numbers post-Merger shows that the Offering Documents were misleading. *See* Pls. Mem. at 14 (citing Am. Compl. ¶ 128). Analysts' disappointment that WBD did not have more active and core subscribers, however, does not tend to show that analysts were misled into believing that WBD's previously-reported figures included only active and core subscribers.

## 2.   Content Licensing Strategy

Plaintiffs allege that the Offering Documents were materially misleading because they disclosed that WarnerMedia licensed content to third parties and that changes in WarnerMedia's licensing agreements with third parties could cause a decline in WBD's revenue without disclosing that, prior to the Merger, WarnerMedia had "largely halted" new content licensing deals with third parties in favor of providing content directly to HBO Max.  *See* Am. Compl. ¶¶ 135–41.  For the same reason, Plaintiffs take issue with Discovery's February 24, 2022 statement that WarnerMedia was selling its television series to "over 20 platforms and outlets" and was "a content maker and content owner generating significant revenue, free cash flow and most importantly, optionality."[19]  *Id.* ¶¶ 142–43.

Failure to disclose in the Offering Documents that, prior to the Merger, WarnerMedia had begun de-prioritizing third-party licensing deals does not constitute an actionable omission because the statements that were made were not misleading.  Plaintiffs again do not dispute that the Offering Documents contained accurate information about WarnerMedia's then-existing strategy to license content to third parties.  *See* Pls. Mem. at 17–18.  Plaintiffs argue that, to avoid misleading investors, Defendants were, nevertheless, obligated to disclose that WarnerMedia was winding down the number of third-party licensing deals it was doing.  *See id.*

---

[19]    Defendants primarily argue that Plaintiffs have not adequately alleged any materially misleading omissions because: (1) WarnerMedia's decision to de-prioritize third-party licensing deals was public knowledge long before the Merger; (2) the Offering Documents accurately disclosed the existence of  licensing arrangements; (3) Defendants were not obligated to disclose their business strategy with respect to third-party licensing deals; (4) the Offering Documents warned investors that licensing deals may not be renewed in the future; (5) Plaintiffs failed to allege that Defendants knew about WarnerMedia's de-prioritization of third-party licensing deals; and (6) Plaintiffs did not adequately allege materiality.  *See* WBD Defs. Mem. at 12–16.

In response, Plaintiffs primarily argue that: (1) Defendants cannot raise a "truth-on-the-market defense" using materials beyond the Amended Complaint at the motion-to-dismiss stage; (2) Defendants' assertion that they did not know about changes to WarnerMedia's licensing strategy is inconsistent with their argument that the market knew about it and, in any event, Defendants had an obligation to know available information; (3) half-truths are actionable even if they do not contain misstatements; and (4) WarnerMedia's reduction in licensing deals was material given its alleged effect on WBD's revenue and EBITDA.  *See* Pls. Mem. at 17–21.

A company is not, however, required to "disclose changes to its business plans" unless it has previously "stated its intention to adhere exclusively to a particular strategy and then changed its strategy without informing investors." *Friedman v. Endo Int'l PLC*, No. 16-CV-3912 (JMF), 2018 WL 446189, at *6 (S.D.N.Y. Jan. 16, 2018) (internal quotation marks and citations omitted).  Statements "reflect[ing] company policy at the time" are "not promises to maintain that policy in the future, and thus [are] not rendered misleading by the company's subsequent consideration of an alternative plan." *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 811 (2d Cir. 1996) (concluding that plaintiffs failed to allege actionable omissions under Section 10(b)); *In re Meta Materials Inc. Secs. Litig.*, No. 21-CV-7203 (CBA) (JRC), 2023 WL 6385563, at *21 (E.D.N.Y. Sept. 29, 2023) (concluding that plaintiffs failed to allege actionable omissions under Section 11 even though the defendant "did not explicitly disclose its pivot [applying technology to a different product]" because "companies are generally not required to disclose shifts in business strategy" (collecting cases)).

Plaintiffs do not allege that Defendants signaled that WarnerMedia would license content exclusively to third parties.  To the contrary, the Amended Complaint discusses WarnerMedia's public efforts to attract HBO Max subscribers by releasing some content exclusively to it in lieu of third-party licensing deals.  *See, e.g.*, Am. Compl. ¶¶ 40, 43–44.  Defendants were, therefore, not obligated to disclose that WarnerMedia had "largely" abandoned new content licensing deals and was instead focusing on its streaming platform.[20]

---

[20]      During its second quarter earnings call, WBD explained disappointing revenue numbers by pointing to pre-Merger conduct by WarnerMedia that "significant[ly] reduc[ed] external content sales."  Am. Compl. ¶ 137.  Plaintiffs do not allege the extent to which new content licensing deals had actually been "halted" before the Merger.  Nor do Plaintiffs specify whether WBD's statement meant that WarnerMedia had quit renewing existing deals or whether WarnerMedia had merely stopped initiating new deals.  The Amended Complaint, therefore, does not allege sufficient facts from which the Court can infer that Defendants had a duty to disclose a change in WarnerMedia's business strategy.

This conclusion is buttressed by publicly available reports before the Merger that WarnerMedia investors would see "many of [WarnerMedia's] signature titles exclusively on [its] platform" going forward.  2019 Investor Call Tr., Dkt. 88-11, at 12; *see also* CNBC Article, Dkt. 88-15; Hollywood Reporter Article, Dkt. 88-16.[21]  Similarly, the Registration Statement cautioned investors that distribution agreements "generally have a limited term which may vary by territory and distributor, and there can be no assurance that these distribution agreements will be renewed in the future or that they will be renewed on terms that are favorable to WBD." Registration Statement at 78.  *See Dingee v. Wayfair Inc.*, No. 15-CV-6941 (DLC), 2016 WL 3017401, at *5 (S.D.N.Y. May 24, 2016) (concluding that plaintiffs failed to state actionable omissions under Section 10(b) in part because "'there is no duty to disclose information to one who reasonably should already be aware of it'" (quoting *Sibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978)); *N.J. Carpenters Health Fund v. Residential Cap., LLC*, No. 08-CV-8781 (HB), 2010 WL 1257528, at *6–7 (S.D.N.Y. Mar. 31, 2010) (concluding that plaintiffs failed to state actionable omissions under Sections 11 and 12(a)(2) because the defendant's disclosures "warned of the risks related to the[] alleged misstatements and omissions" and the

---

[21]     Plaintiffs take issue with Defendants' reference to materials outside the Amended Complaint.  *See* Pls. Mem. at 18.  It is well established, however, that "it is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

        Plaintiffs also argue that the Court should ignore what amounts to a "truth-on-the-market" defense — which affects materiality — at the motion-to-dismiss stage.  *See* Pls. Mem. at 18.  As a preliminary matter, the Court's conclusion primarily rests on the grounds discussed *supra*.  In any event, the Court only considers the fact of publicly disclosed information in support of its conclusion that Defendants did not have a *duty to disclose* further information, not to support any finding that the information was not material.  *See Dingee v. Wayfair Inc.*, No. 15-CV-6941 (DLC), 2016 WL 3017401, at *4–5 (S.D.N.Y. May 24, 2016) (distinguishing materiality from the duty to disclose in connection with Section 10(b) claims and discussing publicly available information when analyzing both at the motion-to-dismiss stage); *N.J. Carpenters Health Fund v. Residential Cap., LLC*, No. 08-CV-8781 (HB), 2010 WL 1257528, at *7 (S.D.N.Y. Mar. 31, 2010) (same in connection with Section 11 and 12(a)(2) claims).

defendant did not have a duty under Sections 11 and 12(a)(2) to disclose information that was "publicly known").

For all of those reasons, Plaintiffs have not adequately alleged actionable omissions in the Offering Documents arising from the disclosures that were made regarding WarnerMedia's content licensing strategy.

### 3. Profitability of Investment in the Development of Content

Plaintiffs allege that the Offering Documents were materially misleading because they disclosed that WarnerMedia had invested substantial sums in content development without disclosing that WarnerMedia had done so without analyzing whether that investment likely would be profitable.[22]  *See* Am. Compl. ¶¶ 146–59.

Failure to disclose in the Offering Documents that WarnerMedia had not analyzed whether its investment in content likely would be profitable does not constitute an actionable omission because Plaintiffs did not adequately allege that WarnerMedia had not, in fact, analyzed whether its investment in content development likely would be profitable.  Although WBD asserted, post-Merger, that certain investments of legacy WarnerMedia did not meet "the [return-on-investment] hurdles that [WBD] would like to see for major investments," and that WBD deemed the investment case for certain projects "[in]adequate," *id.* ¶¶ 151–52, that is a far

---

[22]     Defendants primarily argue that Plaintiffs have not adequately alleged any materially misleading omissions because: (1) Plaintiffs have not adequately alleged that WarnerMedia failed to analyze whether its investment in content development would likely be profitable; (2) the Offering Documents accurately disclosed WarnerMedia's historical investments and made no promises about their quality or future performance; (3) Plaintiffs have not adequately alleged that Defendants possessed the allegedly omitted information at the time the Offering Documents were issued; and (4) Plaintiffs failed to allege that the omissions were material.  *See* WBD Defs. Mem. at 16–18.

   In response, Plaintiffs primarily argue that: (1) they are relying on WBD's statement about WarnerMedia's analysis of the profitability of its investment in content development, the meaning of those statements is a factual dispute not suitable for resolution at the motion-to-dismiss stage, and Plaintiffs' interpretation of the statement is reasonable; (2) the Offering Documents were misleading even though they were literally true; (3) Plaintiffs adequately alleged that the omitted information was accessible to Defendants pre-Merger; and (4) Plaintiffs alleged that the omission had an impact on a quantitatively material share of WBD's revenues.  *See* Pls. Mem. at 21–23.

cry from evidence that WarnerMedia had failed entirely to analyze the likely profitability of its multi-billion-dollar investments in content — a generally dubious proposition.  The Amended Complaint, therefore, does not adequately allege the existence of the fact that Defendants supposedly failed to disclose.  *See In re China Mobile Games & Ent. Grp., Ltd. Secs. Litig.*, No. 14-CV-4471 (KMW), 2016 WL 922711, at *5 (S.D.N.Y. Mar. 7, 2016) (concluding that plaintiffs failed to state claims under Sections 10(b) and 11 based on the defendant's omission of related-party transactions because they "fail[ed] to specifically plead facts showing that there were related-party transactions to disclose"); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 76, 88–89 (S.D.N.Y. 2015) (concluding that plaintiffs failed to state actionable omissions under Sections 10(b) and 11 because plaintiffs did not allege "facts the omission of which rendered [the defendant's] representations misleading to reasonable investors"); *In re Wachovia Equity Secs. Litig.*, 753 F. Supp. 2d 326, 377 (S.D.N.Y. 2011) (concluding that plaintiffs failed to state actionable omissions under Section 11 because the complaint contained "no facts supporting" their conclusory assertions).

For all of those reasons, Plaintiffs have not adequately alleged actionable omissions in the Offering Documents regarding whether WarnerMedia had analyzed the likelihood that its investment in content development likely would be profitable.

### 4.  Direct-to-Streaming Strategy

Plaintiffs allege that the Offering Documents were materially misleading because they disclosed that WarnerMedia's revenues from content "consist[ed] primarily" of licensing feature films for initial theatrical exhibition and licensing television programs for initial television broadcast without disclosing that WarnerMedia had "shifted away" from licensing feature films for theatrical distribution and shifted toward a direct-to-streaming model, a strategy that

purportedly lacked economic value.  *See* Am. Compl. ¶¶ 171–72.  Plaintiffs also allege that the

Offering Documents were misleading because they stated that WarnerMedia produced and

released feature films "for initial exhibition in theaters, on HBO Max and, in 2021,

simultaneously [to] theaters and [to] HBO Max domestically," even though WarnerMedia had

extended into 2022its strategy of releasing films simultaneously in theaters and to HBO Max.[23]

*See id.* ¶¶ 173–74.

  These complained-of omissions are not actionable.  As a threshold matter, Plaintiffs have

not adequately alleged that the information they complain was wrongfully omitted from the

Offering Documents is factual.  The premise for Plaintiffs' allegation that WarnerMedia had

"shifted away" from licensing feature films for theatrical distribution in favor of a direct-to-

streaming model, *see* Am. Compl. ¶ 172, is their contention that WarnerMedia continued, in

2022, to release feature films simultaneously on HBO Max and to theaters, *see id.* ¶ 166.

Plaintiffs do not allege any facts to support that premise.  They cite to WBD's second quarter

earnings call, but the transcript of that call does not support Plaintiffs' assertion.  *See* Aug. 2022

Earnings Call Tr., Dkt. 88-8.  During the earnings call, WBD stated that it "[could not] find an

economic case" or "economic value" for "this idea of expensive films going direct-to-

---

[23]   Defendants primarily argue that Plaintiffs have not adequately alleged any materially misleading omissions because: (1) the Offering Documents did not represent that WarnerMedia would receive no revenue from direct-to-streaming movies, was shifting away from its primary revenue stream for feature films, or would continue to release films simultaneously to theaters and to HBO Max into 2022; (2) WarnerMedia had no duty to disclose its business plans; (3) Plaintiffs did not adequately allege that Discovery possessed the requisite information about WarnerMedia's business plan; and (4) Plaintiffs did not adequately allege materiality.  *See* WBD Defs. Mem. at 18–21.

  In response, Plaintiffs primarily argue that: (1) Defendants' characterization of their allegations is incorrect; and (2) Discovery had access to relevant information about WarnerMedia, which was material to investors.  *See* Pls. Mem. at 23–24.

streaming"[24] and that WBD was "making a strategic shift," including a "commitment to the theatrical exhibition and the theatrical window." *Id.* at 15.  Far from representing that WarnerMedia had released films simultaneously to theaters and to HBO Max into 2022, WBD indicated only that it was *prioritizing* theatrical releases, a position entirely consistent with WarnerMedia's previous statement that it would *not* continue to release films simultaneously to HBO Max and to theaters in 2022.  *See* Am. Compl. ¶ 166.  The Amended Complaint does not allege any facts suggesting otherwise and, therefore, Plaintiffs have not adequately alleged the fact that Defendants supposedly withheld.  *See In re China Mobile Games & Ent. Corp., Ltd. Secs. Litig.*, 2016 WL 922711, at *5; *City of Westland Police & Fire Ret. Sys.*, 129 F. Supp. 3d at 76, 88–89; *In re Wachovia Equity Secs. Litig.*, 753 F. Supp. 2d at 377.

Plaintiffs also fail adequately to allege that, at the time the Offering Documents were issued, any Defendant knew or had access to information indicating that a direct-to-streaming strategy was not economically viable.  WBD stated in August 2022 — months after the Merger and issuance of the Offering Documents — that, because it had "access now to all the data," it could not find an "economic case" for direct-to-streaming films.  *See* Aug. 2022 Earnings Call Tr. at 15.  Plaintiffs make no effort to explain (in the Amended Complaint or in their briefing)[25] how Discovery or any of its officers or directors would have had access to comprehensive data

---

[24]      While the Court is not an expert in media-speak, its understanding of the term "direct-to-streaming" is the same as Defendants': "direct-to-streaming" refers to the practice of skipping theatrical release in favor of a release solely to streaming platforms.  *See* Defs. Mem. at 19.  Nevertheless, at the motion-to-dismiss stage, the Court assumes that, as Plaintiffs assert, "direct-to-streaming" refers to the release of feature films simultaneously in theaters and on streaming services, as WarnerMedia did in 2021.

[25]      The Amended Complaint alleges that the parties engaged in standard due diligence, including by providing mutual access to a virtual data room, but it does not allege that the data room contained sufficient data for Discovery to conclude that WarnerMedia's direct-to-streaming strategy was not economically viable.  *See* Am. Compl. ¶ 57.  To the contrary, Plaintiffs allege that the information AT&T "made available to Discovery [before the Merger] was lacking significant data necessary for Discovery to be able to conduct a comprehensive and adequate review of WarnerMedia."  *Id.* ¶¶ 212, 214.  Plaintiffs' memorandum merely cites to the standards governing actionable omissions without explaining how those standards apply to their allegations.  *See* Pls. Mem. at 24.

regarding the success *vel non* of WarnerMedia's direct-to-streaming strategy before the Merger closed and only four months after WarnerMedia had purportedly launched the 2022 strategy. *See City of Westland Police & Fire Ret. Sys.*, 129 F. Supp. 3d at 76–77 (dismissing Section 10(b) and 11 claims in part because the complaint "alleg[ed] no facts tending to show that [the defendant's representations] did not fairly align with information it possessed *at the time*"); *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 308 F. Supp. 2d 249, 255–56 (S.D.N.Y. 2004) (concluding that a plaintiff failed to plead an actionable omission under Section 11 because the plaintiff failed to allege that the defendant "possessed information" that would lead it to conclude that its representations were misleading when made).

For all of those reasons, Plaintiffs have not adequately alleged actionable omissions in the Offering Documents arising from the disclosures that were made regarding WarnerMedia's direct-to-streaming strategy.

### 5.   The Future of CNN+

Plaintiffs allege that the Offering Documents were materially misleading because they disclosed that the combination of Discovery's and WarnerMedia's "robust portfolios of entertainment, kids, news and sports content" was "expected to position WBD as a stronger global competitor in streaming and digital entertainment," and that WBD "[would] need to invest substantial amounts in the production or acquisition and marketing of its entertainment, sports and news before it [could] learn[] whether such content [would] reach anticipated levels of popularity with consumers," without disclosing that: WarnerMedia had already invested over $300 million in CNN+; WarnerMedia had "not performed an investment case" for that

expenditure; and Discovery had determined before the Merger closed that CNN+ would be canceled.[26]  *See* Am. Compl. ¶¶ 190–96.

　　There was no duty to disclose information about CNN+ in the Offering Documents. Plaintiffs do not dispute that the disclosures in the Offering Documents were accurate.  They argue instead that Defendants were obligated to provide details about CNN+ because it was the only news streaming platform of either of the merging companies.  *See* Pls. Mem. at 25. Plaintiffs do not explain, however, how Defendants' alleged pre-Merger plan to cancel CNN+ made statements about the broader content strategy of the planned Merged Company (including streaming and digital entertainment, such as CNN) misleading.  The Amended Complaint does not, therefore, adequately allege a duty to disclose additional information about CNN+.  *See Holbrook v. Trivago N.V.*, No. 17-CV-8348 (NRB), 2019 WL 948809, at *15–16 (S.D.N.Y. Feb. 26, 2019) (concluding that plaintiffs failed to state actionable omissions under Section 11 because failing to disclose "detail[s]" about a particular topic does not render a defendant's "broad, non-specific description of [the topic]" misleading; "a duty to disclose does not spring solely from plaintiffs' interest in that omitted fact" (citations omitted)); *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, No. 14-CV-9443 (ER), 2016 WL 2859622, at *9–10 (S.D.N.Y. May 16, 2016) (concluding that the plaintiff failed to state an actionable omission under Section 10(b) because the complaint "nowhere explain[ed] . . . how these alleged

---

[26]　Defendants primarily argue that Plaintiffs have not adequately alleged any materially misleading omissions because: (1) the Offering Documents did not discuss CNN+ let alone state or imply that CNN+ would survive post-Merger; (2) there was no duty to disclose Discovery's business plan for CNN+; (3) Plaintiffs did not adequately allege that the decision had been made to cancel CNN+ prior to the Merger; and (4) Plaintiffs did not adequately allege materiality.  *See* WBD Defs. Mem. at 21–23.

　　In response, Plaintiffs primarily argue that: (1) reports from CNN insiders and the timing of WBD's cancellation of CNN+ indicate that the decision had been made pre-Merger; (2) the Offering Documents referred to CNN+ because it was the only news streaming platform of either company; (3) WarnerMedia hyped CNN+ and was therefore required to disclose a change in its business plan; and (4) Plaintiffs adequately alleged materiality given WBD's investment of time, money, personnel, and goodwill into CNN+.  *See* Pls. Mem. at 24–26.

omissions rendered any of [the defendants'] prior statements false or misleading" even though the defendants' disclosures were generally "opa[que]"); *In re Agria Corp. Secs. Litig.*, 672 F. Supp. 2d 520, 529 (S.D.N.Y. 2009) (concluding that the plaintiff failed to state an actionable omission under Sections 11 and 12(a) because, read "in context," the defendant's representations were not misleading).

For all of those reasons, Plaintiffs have not adequately alleged actionable omissions in the Offering Documents regarding putative pre-Merger decisions regarding CNN+.

### 6. Discovery's Due Diligence

Finally, Plaintiffs allege that the Offering Documents were materially misleading because they disclosed that Discovery and WarnerMedia had scrutinized each other's investment plans and given each other access to virtual data rooms (including non-public financial information) as part of the due diligence process but failed to disclose that: Discovery had not scrutinized WarnerMedia's spending on content; Discovery had not been given comprehensive access to WarnerMedia's financial and streaming data; WarnerMedia had refused to disclose certain data; and the due diligence process had suffered from other defects.[27]  *See* Am. Compl. ¶¶ 199–218.

Plaintiffs have not alleged actionable omissions because the Offering Documents did not represent that Discovery was given comprehensive access to WarnerMedia's non-public

---

[27]     Defendants primarily argue that Plaintiffs have not adequately alleged any materially misleading omissions because: (1) the Offering Statements did not purport to describe the due diligence process in exhaustive detail or to comment on its sufficiency; (2) Defendants were not required to characterize their diligence negatively; (3) reasonable investors would have understood that Discovery did not have unfettered access to information about WarnerMedia; and (4) Plaintiffs did not adequately allege that Discovery's diligence was deficient.  *See* WBD Defs. Mem. at 23–26.

          In response, Plaintiffs primarily argue that: (1) Defendants conceded that they only conducted due diligence after the Merger closed, which led to a significant reduction in WBD's EBITDA and free cash flow estimates; (2) investors were misled into believing that Defendants' due diligence had been adequate; and (3) Plaintiffs adequately alleged that Discovery's due diligence fell short of industry norms.  *See* Pls. Mem. at 26–28.

information.  The Offering Documents stated only that, as is typical leading up to a merger, the

parties had engaged in due diligence.  Plaintiffs suggest in their briefing that Discovery did not

engage in *any* due diligence, *see* Pls. Mem. at 27, but that assertion is belied by the Amended

Complaint, which discusses a "year-long due diligence process," Am. Compl. ¶¶ 103, 206; *see*

*also* 2021 Discovery Board Materials, Dkt. 88-22.  Neither the fact that the Offering Documents

did not disclose the details of the diligence process, nor the fact that WBD eventually revised its

projected EBITDA,[28] renders Defendants' representations that due diligence was conducted false

or misleading.  *See NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*, No. 10-CV-440

(LAK) (HBP), 2012 WL 3191860, at *18–19 (S.D.N.Y. Feb. 9, 2012) (concluding that a

defendant's representations that it conducted "extensive due diligence" with respect to an

acquisition did not give rise to actionable omission claims under Sections 11 and 12(a)(2) even

though the defendant reported write-downs and deteriorated asset values following the

transaction because plaintiffs did not "identify any representations made by [the defendant] about

the adequacy of its due diligence efforts" or allege that the company "did not actually perform

due diligence"; they merely alleged that the due diligence "turned out to be *inadequate*"), *report*

*& recommendation adopted*, Order, No. 10-CV-440 (LAK) (S.D.N.Y. Mar. 16, 2012), Dkt. 65;

*In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 308 F. Supp. 2d at 256 (concluding that a

defendant's failure to disclose that it performed "no due diligence" on its customers did not give

---

[28]     Plaintiffs cite to media and analyst reports asking whether the Merger was the "Worst $100 billion Merger
Ever," stating that AT&T had not disclosed certain "highly competitive information" to Discovery during due
diligence, and stating that Discovery "appear[ed] to have misjudged the base earnings of [WarnerMedia]
significantly (which is pretty surprising for a deal of this scale to say the least)."  Am. Compl. ¶¶ 205, 219.  Public
speculation that Discovery misjudged WarnerMedia's profitability does not tend to show, however, that Discovery
failed to conduct due diligence.

rise to an actionable omission claim under Section 11 because the plaintiff's "vague" allegation "[did] not indicate that [the defendant] failed to conduct due diligence").[29]

Plaintiffs' allegations are also inadequate because "the federal securities laws do not require a company to accuse itself of wrongdoing," *In re Citigroup, Inc. Secs. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (collecting cases), "let alone" — as in this case — to disclose "conduct not pled as unlawful," *In re DraftKings Inc. Secs. Litig.*, 650 F. Supp. 3d 120, 170 n.22 (S.D.N.Y. 2023).  Because Defendants did not have a duty to disclose that their due diligence was, in Plaintiffs' view, inadequate,[30] Plaintiffs' claim fails.

As a general matter, the Amended Complaint attempts to engineer Securities Act claims based on WBD's downward adjustment of its projected EBITDA following the Merger.  This type of "hindsight" pleading, however, falls short.  *See Chen v. Missfresh Ltd.*, No. 22-CV-9836 (JSR), 2023 WL 7289750, at *15 (S.D.N.Y. Nov. 6, 2023) (concluding that plaintiffs' Section 11 claim failed because allegations that the defendant should have warned investors that its online sales platforms would need to be shut down were "[a]t bottom . . . nothing more than a claim of

---

[29]      The cases Plaintiffs cite to the contrary, *see* Pls. Mem. at 27–28, are readily distinguishable, *see Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) (concluding that plaintiffs alleged actionable omissions under the Securities Act in part because the defendant discussed its "pollution abatement equipment and its provision of monitoring environmental teams on duty 24 hours a day" yet failed to disclose that those measures were "failing to prevent substantial [regulatory] violations"); *In re Am. Intern. Grp., Inc. 2008 Secs. Litig.*, 741 F. Supp. 2d 511, 527, 530 (S.D.N.Y. 2010) (concluding that plaintiffs alleged actionable omissions under Section 10(b) where the defendant represented that it engaged in "extensive due diligence" before entering swap contracts but an executive allegedly revealed that the company in fact "did not request access to the counterparties' own valuation or analytical materials relating to the investment").

[30]      Plaintiffs cite Discovery's May 2021 board meeting materials in support of their assertion that Discovery knew that its diligence was inadequate before the Merger.  *See* Am Compl. ¶ 206.  The board materials reflect, however, that both WarnerMedia and Discovery had refused certain diligence requests due to, among other reasons, "[c]ompetitive issues" — not that Discovery knew that its diligence was inadequate.  *See* 2021 Board Materials at 5.

The parties do not dispute that the securities laws assume that investors "take[] into account the customs and practices of the relevant industry."  WBD Defs. Mem. at 24 (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015)); *see also* Pls. Mem. at 28.  A reasonable investor would have understood that the due diligence process, as is the case leading up to any merger, had been limited in some respects.

fraud-by-hindsight"); *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) (concluding that the plaintiff's Section 11 and 12(a)(2) claims failed because allegations that the defendant should have disclosed that it was going to report a loss presented a "classic example of pleading with 20/20 hindsight") (internal quotation marks and citation omitted)).

For all of those reasons, Plaintiffs have not adequately alleged actionable omissions in the Offering Documents regarding the thoroughness of Discovery's due diligence.

## II.     Plaintiffs Have Not Adequately Stated Claims Under Section 15 of the Securities Act

To state a claim under Section 15 of the Securities Act ("Section 15"), a plaintiff must allege "a primary violation by a controlled person, and [ ] control by the defendant of the primary violator." *In re Global Crossing, Ltd. Secs. Litig.*, 322 F. Supp. 2d 319, 349 (S.D.N.Y. 2004) (citations omitted).  Because Plaintiffs failed adequately to allege any primary violation under Sections 11 and 12(a)(2) of the Securities Act, Plaintiffs' claims under Section 15 fail as well.[31] *See Rombach*, 355 F.3d at 177–78 (concluding that because the district court properly dismissed the primary securities claims against individual defendants under Sections 11 and 12(a)(2), "secondary claims" under Section 15 were also properly dismissed).

---

[31]     The Court need not, therefore, address the merits arguments raised by the Advance Defendants.  *See* Advance Defs. Mem. at 1–4.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are GRANTED and the case is

DISMISSED with prejudice.[32]

The Clerk of Court is respectfully directed to close any open motions and to close the

case.

**SO ORDERED.**

**Date:  February 5, 2024**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**

---

[32]    Plaintiffs' request for leave to amend, *see* Pls. Mem. at 30, is denied because they have given no indication how amendment would cure the deficiencies in the Amended Complaint, *see Attestor Value Master Fund v. Republic of Arg.*, 940 F.3d 825, 833 (2d Cir. 2019).